### In re CATFISH ANTITRUST LITIGATION.

### No. MDL 928.
### No. 2:92–CV–073–D–O.

United States District Court,
N.D. Mississippi,
Delta Division.

June 28, 1993.

---

John W. "Don" Barrett, Barrett Law Offices, Lexington, MS, Frank O. Crosthwait, Jr., Richard G. Noble, Crosthwait, Terney, Noble & Allain, Indianola, MS, Janet G. Arnold, Holcomb, Dunbar, Connell, Chaffin & Willard, Oxford, MS, Vance K. Opperman, Opperman, Heins & Paquin, Minneapolis, MN, Warren Rubin, Gross Law Offices, Philadelphia, PA, James S. Bailey, Jr., Bailey, Harring & Peterson, Denver, CO, Todd R. Seelman, Bailey, Harring & Peterson, Denver, CO, Richard O. Kingrea, Adams and Reese, New Orleans, LA, Gordon Ball, Gordon Ball, Knoxville, TN, for plaintiffs.

Stephen Lee Thomas, Lake, Tindall, Hunger & Thackston, Greenville, MS, for defendants.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

This litigation presently consists of thirteen individual lawsuits which were filed in various federal district courts throughout the country. While most of the actions were filed here in the Northern District of Mississippi, there were also filings in the Western District of Washington, Eastern District of Pennsylvania, Eastern District of Louisiana, and the Eastern District of Tennessee. In accordance with 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation has transferred all cases to this district for centralized and consolidated pretrial proceedings.

The named plaintiffs in this litigation are food distributors who purchased catfish and catfish products from 1981 until 1990, from various companies that were engaged in the business of processing and selling farm raised catfish and catfish products. In the consolidated class action complaint which was

filed on October 14, 1992, the named plaintiffs (distributors) invoke section 4 of the Clayton Act (15 U.S.C. § 15)[1] as a means to recover treble damages, costs of suit, and attorneys' fees for the defendants' (processors/sellers) alleged violations of section 1 of the Sherman Act. The sum and substance of the consolidated complaint is that the defendants have engaged in a combination and conspiracy, since at least 1981 through 1990, to suppress and eliminate competition in the catfish industry by fixing prices of catfish and catfish products sold throughout the United States. It is alleged that the defendants agreed to establish minimum prices for catfish and certain catfish products and to adhere to the established minimum prices. As a consequence, plaintiffs allege injury in that the prices paid for catfish were artificially high and at non-competitive levels.

As noted above, the litigation began as thirteen separate actions filed in various districts.[2] However, since all actions have been consolidated under the "master file" for pretrial treatment, the court had the benefit of consolidated motions, responses, and memorandum briefs which pertain to all actions. The named plaintiffs, on behalf of themselves and a class of all those similarly situated, are as follows: State Fish Distributors, Inc.; Robert Orr–Sysco Food Services Co.; Randle Trout Distributors, Inc.; Farm House Food Distributors, Inc.; and, American Seafood, Inc. The defendants in this case are the following catfish processors: Magnolia Processing, Inc. ("Magnolia"); Delta Pride Catfish, Inc. ("Delta Pride"); Simmons Farm Raised Catfish, Inc. ("Simmons"); Farm Fresh Catfish Company ("Farm Fresh"); Country Skillet Catfish Company ("Country Skillet"); ConAgra; and Southern Pride Catfish Company, Inc. ("Southern Pride").[3] All defendants, except for Southern Pride, have filed motions to dismiss plaintiffs' third amended class action complaint. The motions to dismiss are advanced under F.R.C.P. 12(b)(6), failure to state a claim upon which relief can be granted, and 9(b), failure to aver fraud with particularity. Also ripe for consideration is the motion by the named plaintiffs to certify a class action pursuant to F.R.C.P. 23. In order to better understand the legal issues which the court considers, a brief sketch of the catfish industry is presented before addressing the motions to dismiss.

1. The complaint also seeks injunctive relief pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26 (Supp.1993).

2. *State Fish Distributors, Inc. v. Magnolia Processing, Inc., et al.,* 2:92–CV–20–D–O, N.D.Miss.; *Farm House Food Distributors, Inc. v. Magnolia Processing, Inc., et al.,* 2:92–CV–030–D–O, N.D.Miss.; *Randle Trout Distributors, Inc. v. Country Skillet Catfish Co., et al.,* 2:92–CV–122–D–O, transfer from W.D.Wash.; *American Seafood, Inc. v. Magnolia Processing, Inc., et al.,* 2:92–CV–113–D–O, transfer from E.D.Pa.; *Levy World Limited Partnership v. Magnolia Processing, Inc., et al.,* 2:92–CV–114–D–O, transfer from E.D.Pa.; *American Seafood, Inc. v. Southern Pride Catfish Co., Inc.,* 2:92–CV–115, transfer from E.D.Pa.

 The following cases were dismissed without prejudice so that plaintiffs might subsequently file a claim in the event a class action suit, pursued by other plaintiffs, is certified: *Rose's Wholesale Seafood, Inc. v. Magnolia Processing, Inc., et al.,* 2:92–CV–026–D–O, N.D.Miss., Notice of Voluntary Dismissal pursuant to F.R.C.P. 41(a)(1) entered June 17, 1992; *Lemoyne Cold Storage, Inc. v. Magnolia Processing, Inc., et al.,* 2:92–CV–031–D–O, N.D.Miss., Rule 41(a)(1) Stipulation of Dismissal entered August 31, 1992; *Robert Orr–Sysco Food Serv. Co. v. Country Skillet*

*Catfish Co., et al.,* 2:92–CV–044–D–O, N.D.Miss., Order of Dismissal entered April 8, 1993; *J & M Foods, Inc. v. Magnolia Processing, Inc., et al.,* 2:92–CV–053–D–0, N.D.Miss., Rule 41(a)(1) Stipulation of Dismissal entered August 31, 1992; *Gilbert Robinson Parent Co. v. Magnolia Processing, Inc., et al.,* 2:92–CV–144–D–O, N.D.Miss., Rule 41(a)(1) Stipulation of Dismissal entered November 25, 1992.

 The following cases are "tag along" actions which were late transfers to this district: *Schwegmann Giant Super Market v. Delta Pride Catfish, Inc., et al.,* 2:92–CV–175–D–O, transfer from E.D.La., Rule 41(a)(1) Order of Dismissal entered May 27, 1993; *Copper Cellar Corp. v. Delta Pride Catfish, Inc., et al.,* 2:92–CV–028–D–O, transfer from E.D.Tenn. (originally filed in Tennessee state court; Rule 41(a)(1) Order of Dismissal entered May 17, 1993).

3. In plaintiffs' memorandum brief, the court is informed that all of the defendants named in this civil suit were also identified as co-conspirators in various Informations which were filed by the United States Department of Justice, Antitrust Division, charging price fixing in the catfish industry. *See U.S. v. Magnolia,* Crim. No. 92–11–1 (E.D.Pa.); *U.S. v. Hinote,* Crim. No. 92–00430 (E.D.Pa.); *U.S. v. Delta Pride,* No. 92 CR 1090 (N.D.Ill.).

## Background

Catfish aquaculture experienced growth explosion in the 1980s. The consumer market for catfish expanded beyond its traditional base in the Deep South, and markets were cultivated in regions throughout the country, with particular success in the West. This growth was attributed to aggressive marketing along with a consumer preference for leaner, low-fat meat choices. During the 1980s, catfish sales by processors increased tenfold, and catfish is now a $400 million per year business. From 1986 through 1989 alone, ten new processing plants entered the business.

Catfish production begins with young fish, fingerlings, which are raised in hatcheries to a size that can be transported to catfish ponds. Once transferred to the production ponds, the fingerlings may take up to two years to reach harvesting maturity. The defendants purchase farm-raised catfish which they process and then sell to wholesalers and retailers for distribution to final consumers. Once the processors purchase live fish from the producers, the fish go through various stages of processing at processing plants. Initially, the fish are beheaded, eviscerated and skinned. The processor may then sell the whole processed fish, or further processing could occur. For example, the whole fish could be cut into steaks, which are cross-section cuts; filets, which are the boned side of the fish; nuggets, which are small filets cut from below the rib; or strips, finger-size pieces of fish cut from the filets. Once the fish are processed and cut into the desired serving portion, the catfish are either packed in ice or frozen for shipment.

Catfish is a highly concentrated industry. Approximately 80% of the nation's catfish is produced and processed in the Mississippi Delta region, and neighboring Alabama is the second leading producer. Delta Pride, Country Skillet, and Farm Fresh are considered the "big three," in catfish processing; and in 1988, these three processors accounted for more than 70% of the industry's processing capacity. In more recent years, it has been reported that Delta Pride and Farm Fresh have lost some of their market share to new entrants. However, Delta Pride, a farmer-owner cooperative, is, and has always been, the dominant force in the catfish production/processing business.

## MOTIONS TO DISMISS

### Rule 12(b)(6) Standard

A Rule 12(b)(6) motion is disfavored, and it is rarely granted. *Clark v. Amoco Production Co.*, 794 F.2d 967, 970 (5th Cir. 1986); *Sosa v. Coleman*, 646 F.2d 991, 993 (5th Cir.1981). Dismissal is never warranted because the court believes the plaintiff is unlikely to prevail on the merits. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Even if it appears an almost certainty that the facts alleged cannot be proved to support the claim, the complaint cannot be dismissed so long as the complaint states a claim. *Clark v. Amoco Production Co.*, 794 F.2d 967, 970 (5th Cir.1986); *Boudeloche v. Grow Chemical Coatings Corp.*, 728 F.2d 759, 762 (5th Cir. 1984). "To qualify for dismissal under Rule 12(b)(6), a complaint must on its face show a bar to relief." *Clark*, 794 F.2d at 970; *see also Mahone v. Addicks Utility Dist.*, 836 F.2d 921, 926 (5th Cir.1988); *United States v. Uvalde Consolidated Ind. School Dist.*, 625 F.2d 547, 549 (5th Cir.1980), *cert. denied*, 451 U.S. 1002, 101 S.Ct. 2341, 68 L.Ed.2d 858.

The court accepts the facts alleged by plaintiffs in the complaint as true and views the material allegations of the complaint "as admitted," along with such reasonable inferences that might be drawn in plaintiffs' favor. *Garguil v. Tompkins*, 704 F.2d 661, 663 (2d Cir.1983), *vacated on other grounds*, 465 U.S. 1016, 104 S.Ct. 1263, 79 L.Ed.2d 670 (1984); *Murray v. City of Milford*, 380 F.2d 468, 470 (2d Cir.1967); *In re Energy Systems Equipment Leasing Securities Litig.*, 642 F.Supp. 718, 723 (E.D.N.Y.1986). Dismissal is appropriate only when the court accepts as true all well-pled allegations of fact and, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Thomas v. Smith*, 897 F.2d 154, 156 (5th Cir.1989), quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 100–02, 2 L.Ed.2d 80 (1957); *see Hishon v. King & Spalding*, 467 U.S. 69, 73,

104 S.Ct. 2229, 2232, 81 L.Ed.2d 59, 65 (1984); *Mahone v. Addicks Utility Dist.,* 836 F.2d 921, 926 (5th Cir.1988); *McLean v. International Harvester,* 817 F.2d 1214, 1217 n. 3 (5th Cir.1987); *Jones v. United States,* 729 F.2d 326, 330 (5th Cir.1984).

■ When a defendant moves to dismiss a complaint, the court focuses solely on the legal sufficiency of the pleadings. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90, 96 (1974). The court is restricted to the face of the pleadings and may look only within the four corners of the complaint in evaluating a Rule 12(b)(6) motion. *Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir.1985); *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984); *In re Energy Systems Litig.,* 642 F.Supp. 718, 723 (E.D.N.Y.1986).

*Motions to Dismiss by Defendants Country Skillet, ConAgra, Magnolia, Farm Fresh, Simmons and Delta Pride*

Defendants Farm Fresh,[4] Simmons,[5] and Delta Pride [6] submitted a consolidated memorandum in support of their motions to dismiss. Magnolia Processing [7] joins in the motion to dismiss but relies upon memorandum briefs submitted by other parties. Defendants Country Skillet and ConAgra [8] submitted a separate memorandum brief. In support of the motions to dismiss, all defendants rely upon the same legal arguments; therefore, collective consideration of the motions is possible. However, in the discussion which follows, facts and issues which are pertinent to specific defendants will be duly noted.

There are three issues which the defendants raise for the court's attention in support of their motions to dismiss. The three issues are as follows. First, defendants assert that the plaintiffs' claims of conspiracy are merely conclusory allegations which fail to set forth sufficient details and are therefore insufficient to state a claim upon which relief can be granted. The second and third issues are interrelated. Defendants argue that the plaintiffs have failed to allege fraudulent concealment of the conspiracy with the particularity required by F.R.C.P. 9(b). The issue of fraudulent concealment has a direct impact upon the third argument in support of the motions. Defendants argue that since plaintiffs have not properly pled fraudulent concealment, then the Clayton Act's four year statute of limitations would bar plaintiffs' claims which are based on conduct that allegedly occurred more than four years prior to the filing of the complaint. In turn, the court now considers defendants' arguments in support of the motions to dismiss.

*A. Insufficient Allegations of Conspiracy*

The first component of defendants' argument is that plaintiffs' allegations of a conspiracy are insufficient to state a claim. Defendants argue that since concerted activity is an indispensable element of a Sherman Act claim,[9] then the claims should be dismissed because the complaint includes insufficient factual allegations of concerted activity against each and every defendant. Accord-

4. Farm Fresh Catfish Company is a corporation organized under the laws of the State of Minnesota with its principal place of business in Hollandale, Mississippi. Farm Fresh is wholly-owned by George A. Hormel & Co.

5. Simmons Farm Raised Catfish, Inc., is a Mississippi corporation with its principal place of business in Yazoo City, Mississippi.

6. Delta Pride Catfish, Inc., is a Mississippi corporation with its principal place of business located at Indianola, Mississippi. In the past, Delta Pride has transacted business under the trade names, "Fishland" and "Crystal Creek."

7. Magnolia Processing, Inc., is a Mississippi corporation with its principal place of business located at Tunica, Mississippi. In the past, Magno-

lia Processing has transacted business under the name of "Pride of the Pond."

8. In 1991, Country Skillet Catfish Co. was incorporated as a wholly-owned subsidiary of ConAgra, Inc. Prior to 1991, ConAgra operated Country Skillet as a division. Both companies are Delaware corporations. Country Skillet's principal place of business is in Isola, Mississippi. ConAgra's principal place of business is in Omaha, Nebraska. Plaintiffs named both Conagra and Country Skillet as defendants.

9. Citing *Park v. El Paso Bd. of Realtors,* 764 F.2d 1053, 1059 (5th Cir.1985), *cert. denied,* 474 U.S. 1102, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986); *Pierce v. Ramsey Winch Co.,* 753 F.2d 416, 425 (5th Cir.1985).

ing to defendants, "[a]llegations of conspiracy must identify specific acts of each of the alleged conspirators which connect them with the conspiracy." [10]

Regarding the defendants' claim of insufficient allegations of a conspiracy, the plaintiffs' consolidated complaint sets forth the following:

## VIII. OFFENSES CHARGED

30. Beginning at least as early as 1981, and continuing through at least 1990, the exact dates being unknown to plaintiffs, defendants and their co-conspirators entered into and engaged in a combination, and conspiracy to suppress and eliminate competition by fixing prices of catfish and catfish products directly sold throughout the United States.

31. The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the defendants and co-conspirators, the substantial terms of which were to fix prices of catfish and catfish products, throughout the United States, by among other things:

(a) Agreeing to establish minimum prices for certain catfish products; and

(b) Agreeing to adhere to the established minimum prices.

32. For the purposes of forming and carrying out the charged combination and conspiracy, the defendants and co-conspirators did those things that they combined and conspired to do, including among other things:

(a) Participating in meetings and discussions about the prices of catfish and catfish products;

(b) Agreeing, in the course of those meetings and discussions, on minimum prices for catfish and catfish products;

(c) Agreeing, in the course of those meetings and discussions, that the agreed upon minimum prices should go into effect on a certain date;

(d) Agreeing to adhere to established minimum prices for catfish and catfish products;

(e) Monitoring and enforcing compliance with the agreements to adhere to established minimum prices for catfish and catfish products;

(f) In 1983, defendant Magnolia met with certain other companies including Delta Pride. This meeting was held in Sunflower County, Mississippi. The parties in attendance at this meeting agreed to set minimum prices for future sales of catfish and catfish products and the date such prices would go into effect;

(g) In 1984, at least two additional meetings were held. At the first of these meetings, other processors in addition to Magnolia and Delta Pride were represented, including Simmons and Farm Fresh. At both meetings, the persons present reached an agreement on what prices they should be charging for catfish and catfish products. In addition, at either or both of these meetings, a representative of Delta Pride indicated that Country Skillet, another processor not represented at the meeting, would go along with any agreement reached regarding the prices to charge for various catfish and catfish products;

(h) Thereafter, the President and General Manager of defendant Magnolia, William Gidden, continued to have discussions with a representative of Delta Pride who would inform Gidden of the price the processors had agreed to charge for catfish and catfish products and when those prices were to go into effect. Gidden would then agree to go along with the price changes and would implement those changes on behalf of defendant Magnolia;

(i) Early in 1987, Joseph Glover, Jr., the founder of Southern Pride, received a call from a competitor who said he had talked to a number of other catfish processors and that they had agreed to raise prices. Glover continued to have discussions with competitors during the 1987–1990 time period for the purpose of agreeing to and

---

**10.** Citing *United States v. North Coast Transporta-* *tion Co.,* 7 F.R.D. 491 (D.Wash.1947).

fixing prices in the sale of catfish and catfish products;

(j) At least one additional meeting was held in early 1990 which was attended by Southern Pride and top officials of two competitors.

(k) In formulating and effectuating the aforesaid combination and conspiracy, defendants and their co-conspirators did those things which they combined and conspired to do, the substantive terms of which were to artificially raise and fix and maintain prices by establishing minimum prices for various catfish and catfish products, setting the date such prices should go into effect, adhering to such minimum prices and monitoring and enforcing compliance with the agreed upon minimum prices.

Complaint, pgs. 7–10.

The sufficiency of a complaint is governed foremost by Rule 8(a)(2) which requires a "short and plain statement of the claim showing that the pleader is entitled to relief...." It is well settled that the statement of the claim should provide the defendant with fair notice of what the claim is and the grounds upon which it rests. *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80, 85 (1957).

■■■ In a Sherman Act claim, a blanket allegation of a conspiracy is deemed insufficient to place the defendant "on notice" of the claim in order for defendant to formulate an adequate responsive pleading. *Mountain View Pharmacy v. Abbott Laboratories,* 630 F.2d 1383, 1387 (10th Cir.1980); *Larry R. George Sales Co. v. Cool Attic Corp.,* 587 F.2d 266, 273 (5th Cir.1979); *California Dump Truck Owners Ass'n v. Associated General Contractors,* 562 F.2d 607, 615 (9th Cir.1977). Yet, by the same token, there is no requirement of an "inordinate level of factual specificity." *Mountain View Pharmacy,* 630 F.2d at 1388. In the case *sub judice,* the defendants received much more than a generic allegation of conspiracy, and the complaint more than satisfies Rule 8(a)(2) standards. For example, defendants received notice that the plaintiffs allege; a conspiracy among them to establish minimum prices for catfish and catfish products;

agreements to adhere to the established minimum prices; agreements to set dates in which minimum prices were to be implemented; and, monitoring and enforcing compliance with the agreed upon minimum prices. As a means to this end, plaintiffs allege that beginning in 1981 and continuing through 1990, company representatives from the defendant companies engaged in meetings and telephone conversations where discussions occurred and decisions were made as to the prices to be charged for catfish and the dates of implementation. In 1983, it is alleged that Magnolia Processing met with other companies, one of which was Delta Pride, in a meeting held in Sunflower County, Mississippi. The complaint alleges that in 1984, at least two additional meetings were held. In addition to Magnolia and Delta Pride, Simmons and Farm Fresh were also represented. After agreeing at the meetings on the prices that should be charged for catfish and catfish products, it is asserted that a representative of Delta Pride indicated that Country Skillet would "go along" with any agreement that was made. Subparagraph "h" of the complaint asserts that William Gidden, President and General Manager of Magnolia, continued to have discussions with Delta Pride officials wherein Delta Pride would inform Gidden of price changes and the dates of implementation. Subparagraph "I" addresses an allegation that Joseph Glover, Jr., the founder of Southern Pride, engaged in discussions with competitors from 1987–1990, regarding an increase in the prices to be charged for catfish. Finally, the complaint alleges that in early 1990, at least one meeting was held between Southern Pride and top officials of two competitors.

Defendants argue that the class action complaint is lacking the "requisite" specificity in the following areas. First of all, the complaint does not identify all of the company representatives who attended all of the alleged meetings, and there is no explanation of any company authority that the representatives might have possessed. Second, the dates and locations of the meetings are not listed, and "[t]he Complaint also fails to identify any substantive facts concerning the alleged agreement such as the type of product

or products involved and the relevant geographic market affected."

The defendants do not cite the court to any authority which demands the rigid level of detail and specificity of antitrust pleading which defendants advance, or "propose," and none exists. To the contrary, a rigid rule of specificity and detail is disfavored in antitrust cases at the pleadings stage:

> We have held that 'a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' *Conley v. Gibson*, 355 US 41, 45–46, 2 LEd2d 80, 78 SCt 99 [100–02] (1957) (footnote omitted). And in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' *Poller v. Columbia Broadcasting*, 368 US 464, 473, 7 LEd2d 458, 82 SCt 486 [491] (1962), dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.

*Hospital Bldg. Co. v. Trustees of the Rex Hosp.*, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338, 345 (1976).

▪ ConAgra and Country Skillet take sharp issue with the fact that plaintiffs' complaint does not place a ConAgra/Country Skillet representative at any conspiracy meeting or telephone conversation where price-fixing was discussed, agreed upon, implemented, etc. However, plaintiffs have alleged that in at least one meeting held in 1984, a Delta Pride representative indicated that Country Skillet, not represented at the meeting, would "go along" with any agreement reached regarding the prices to charge for catfish and catfish products. ConAgra and Country Skillet wage an adamant argument that their alleged linkage to any conspiracy appears only in the form of a hearsay statement; and, plaintiffs' failure to identify anything more specific, which would indicate more active participation, is fatal to the claims against them.

The assertion in plaintiffs' complaint regarding Country Skillet's acquiescence to the conspiracy is taken as true. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59, 65 (1984); *Thomas v. Smith*, 897 F.2d 154, 156 (5th Cir.1989), quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 100–02, 2 L.Ed.2d 80 (1957); *Mahone v. Addicks Utility Dist.*, 836 F.2d 921, 926 (5th Cir.1988); *McLean v. International Harvester*, 817 F.2d 1214, 1217 n. 3 (5th Cir.1987); *Jones v. United States*, 729 F.2d 326, 330 (5th Cir.1984). Accepting the allegation as true for present purposes on a motion to dismiss, the court finds that the argument advanced by ConAgra and Country Skillet is not well taken. Such acquiescence, or a "meeting of the minds," or "conscious commitment to a common scheme" to achieve an unlawful purpose is sufficient linkage to a claim of civil conspiracy. *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764 n. 9, 104 S.Ct. 1464, 1471 n. 9, 79 L.Ed.2d 775, 786 (1984); *U.S. v. Paramount Pictures, Inc.*, 334 U.S. 131, 142, 68 S.Ct. 915, 92 L.Ed. 1260, 1285 (1948); *See* 16 Am.Jur.2d *Conspiracy* § 50 (1979) (elements of civil conspiracy). Obviously, whether or not plaintiffs will be able to prove Country Skillet's or any other defendant's involvement in the conspiracy is a separate issue to be saved for another day and time.[11]

In summary, the court observes that in order to sustain a claim of a conspiracy in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, plaintiffs will be called upon to prove, (1) that a conspiracy, combination, or agreement (i.e., concerted action) existed, (2) with an aim to restrain trade by suppressing and eliminating competition by fixing prices of processed catfish and catfish products, and that (3) plaintiffs were injured by such concerted action. *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 761–62, 104 S.Ct. 1464, 1470–1471, 79 L.Ed.2d 775, 783–84 (1984); *Purity Products, Inc. v. Tropicana Products, Inc.*, 702 F.Supp. 564, 570 (D.Md. 1988). Accepting the allegations of the com-

---

**11.** Country Skillet also argues that the claim against it does not allege that ConAgra/Country Skillet "went along" with the agreed upon prices, and the failure to allege adherence dooms the claim. The court does not read the com-

plaint so narrowly. The complaint clearly alleges that *all* defendants adhered to the price fixing scheme. Furthermore, the court declines Country Skillet's "invitation" to engage in evidentiary rulings at this stage of the litigation.

plaint as true, as the court is required, plaintiffs have stated a claim upon which relief could be granted if eventually successful in carrying their burden of proof.

## B. Statute of Limitations Bar & Fraudulent Concealment

■ The defendants' second component to the motions to dismiss includes an assertion of the affirmative defense of a statute of limitations bar. Plaintiffs' claims are instituted under section 4 of the Clayton Act, codified at 15 U.S.C. § 15 (Supp.1993). Section 15b presents a four year statute of limitations. "Any action to enforce any cause of action under sections 15, 15a, or 15c of this title shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b (Supp. 1993). Since the first complaint was filed on February 7, 1992, defendants assert that claims which are based on conduct prior to February 1988 should be barred. However, fraudulent concealment tolls the Clayton Act's statute of limitations. *State of Texas v. Allan Construction Co., Inc.*, 851 F.2d 1526, 1528–29 (5th Cir.1988); *In re Beef Industry Antitrust Litig.*, 600 F.2d 1148, 1169 (5th Cir.1979), *reh'g denied*, 616 F.2d 569 (5th Cir.), *cert. denied*, 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980); *General Elec. Co. v. City of San Antonio*, 334 F.2d 480, 483 (5th Cir.1964); *Rinzler v. Westinghouse Elec. Corp.*, 333 F.2d 719, 720 (5th Cir.1964). In view of the tolling effect of the statute of limitations on the Clayton Act, defendants argue that plaintiffs' class action complaint does not plead fraud with the particularity required by F.R.C.P. 9(b).[12] "[U]nless plaintiffs allege fraudulent concealment with the particularity required by Fed.R.Civ.P. 9(b), they cannot avoid the statute of limitations as to those allegations occurring more than four years prior to the initiation of their actions." [13]

■ In ruling upon a motion to dismiss under Rule 9(b), the court must apply Rule 9(b)'s requirement in harmony with the simplicity of notice pleading as allowed by Rule

8. *Craighead v. E.F. Hutton & Co., Inc.*, 899 F.2d 485, 491 (6th Cir.1990); *Cayman Exploration Corp. v. United Gas Pipe Line*, 873 F.2d 1357, 1362 (10th Cir.1989); *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir.1988); *Credit & Finance Corp., Ltd. v. Warner & Swasey Co.*, 638 F.2d 563, 566 (2d Cir.1981). Rule 9(b) does not negate the simplicity and flexibility contemplated by Rule 8, and it would be error to focus on Rule 9(b)'s particularity requirement in a vacuum. *Michaels Bldg. Co.*, 848 F.2d at 679; 5 C. Wright & A. Miller, *Fed. Prac. and Proc.* Civil § 1298, at 617 (1990). "Rule 9(b) requires that the circumstances of fraud be pled with enough particularity to put the party on notice as to the nature of the claim." *J.C. Wyckoff & Assoc. v. Standard Fire Ins., Co.*, 936 F:2d 1474, 1489 (6th Cir.1991). The reason for the rule of particularity is to provide fair notice of the substance of the claim so that the defendant may prepare a responsive pleading. *Michaels Bldg. Co.*, 848 F.2d at 679; *Ross v. A.H. Robins Co., Inc.*, 607 F.2d 545, 557 (2d Cir. 1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); *Denny v. Barber*, 576 F.2d 465, 469 (2d Cir.1978). Furthermore, the court is guided by a well-reasoned approach which other jurisdictions have taken in similar cases. That is, in cases which implicate corporate or business fraud, plaintiffs cannot be expected to have knowledge of all the details which undergird the alleged fraudulent scheme. Therefore, some relaxation of Rule 9(b)'s particularity requirement is appropriate in instances where such information is in the defendant's hands or control. *Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 645 (3d Cir.1989); *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir.1989); *Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674, 680 (6th Cir.1988); *DiVittorio v. Equidyne Extractive Industries Inc.*, 822 F.2d 1242, 1248 (2d Cir. 1987); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir.1987). Especially in the early stages of litigation where pleadings are filed before the commencement of discov-

---

**12.** "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." F.R.C.P. 9(b).

**13.** Defendants' Consolidated Memorandum Brief at 8.

ery, courts are counseled to exercise caution in granting a motion to dismiss based upon Rule 9(b) where the facts underlying the claims are within the defendant's control.[14] *Michaels Bldg. Co.*, 848 F.2d at 680; *Chambers Development Corp. v. Browning–Ferris Ind.*, 590 F.Supp. 1528, 1539 (W.D.Pa.1984); *Eaby v. Richmond*, 561 F.Supp. 131, 137 (E.D.Pa.1983). However, notwithstanding the "relaxed pleading standard" as discussed above, this court finds that plaintiffs have alleged fraudulent concealment with sufficient particularity to meet the challenge posed by defendants' motions to dismiss under Rule 9(b).

The court emphasizes that in this stage, the focus is on the sufficiency of the plaintiffs' allegations as a matter of pleading. Allegations concerning what the evidence might prove as a matter of law are premature at this juncture. Therefore, the court's discussion of the doctrine of fraudulent concealment at this point is specifically tailored for an evaluation of the pleadings.

■ The doctrine of fraudulent concealment contains two elements which a plaintiff must prove. First, the defendant concealed the conduct complained of; and, second, despite the exercise of due diligence, plaintiff failed to discover the facts that form the basis of his claim. *State of Texas v. Allan Construction Co. Inc.*, 851 F.2d 1526, 1528 (5th Cir.1988); *Jensen v. Snellings*, 841 F.2d 600, 607 (5th Cir.1988); *In re Beef Industry Antitrust Litig.*, 600 F.2d 1148, 1169 (5th Cir.1979). It is generally recognized that the statute of limitations is tolled only if the defendant has engaged in affirmative acts of concealment. *Allan Construction Co. Inc.*, 851 F.2d at 1528; *Hennegan v. Pacifico Creative Serv. Inc.*, 787 F.2d 1299, 1302 (9th Cir.), *cert. denied*, 479 U.S. 886, 107 S.Ct. 279, 93 L.Ed.2d 254 (1986); *Berkson v. Del Monte Corp.*, 743 F.2d 53, 55 (1st Cir.), *cert. denied*, 470 U.S. 1056, 105 S.Ct. 1765, 84

L.Ed.2d 826 (1985). However, courts dispense with the requirement of an affirmative act of concealment in instances where the underlying wrong is deemed "self-concealing." In the Fifth Circuit, a self-concealing wrong is one in which, "deception is an essential element for some purpose other than merely to cover up the act." *Allan Construction Co., Inc.*, 851 F.2d at 1530. In *Allan Construction*, the court explained the self-concealment doctrine as follows:

> To steal an antique vase is not a self-concealing wrong; the true owner knows the vase is stolen even if the owner does not know the identity of the thief. On the other hand, to sell a fake vase as if it were an antique is not only fraud, it is a self-concealing wrong. Deception is an essential element of the wrong, and one that is not intended merely to cover up the wrong itself. By contrast, to steal a vase and to replace it with a worthless replica is not self-concealing. The wrong is theft of the vase; the replacement is an act separate from the wrong itself and aimed only at concealing the fact that the real vase has been stolen.

*Allan Construction Co.*, 851 F.2d at 1529–30.

■ In order for a price fixing scheme to be successful, it must be kept secret. It is an illegal endeavor, and public knowledge of its existence spoils the plan. *Allan Construction Co.*, 851 F.2d at 1531. However, the sole purpose of the deception is to cover up the illegal act. Thus, the deception is not considered "an essential element of the wrong."[15] *Id.* If the deception is not an essential element of the wrong, then it follows that fraudulent concealment is not inherent in every price-fixing scheme. Consequently, the question comes full circle with the need to prove affirmative acts of concealment.

---

14. Despite the "non-restrictive application" of Rule 9(b) in cases of corporate fraud, plaintiffs' allegations must include statements of fact upon which the allegations are based and an assertion that the necessary information lies within defendants' control. *Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 645 (3d Cir.1989); *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir.1989); *Madonna v. United States*, 878 F.2d 62, 66 (2d Cir.1989); *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1248 (2d Cir.1987).

15. For an opposite view, see *New York v. Hendrickson Brothers, Inc.*, 840 F.2d 1065, 1084 (2d Cir.1988).

In short, we cannot conclude that Congress, in writing the Clayton Act's four-year statute of limitations, could have intended for the fraudulent concealment doctrine to apply to every price-fixing case. Hence, we reject the State's contention that because the bid-rigging conspiracy was inherently self-concealing, it need not prove affirmative acts of concealment.

*State of Texas v. Allan Construction Co., Inc.,* 851 F.2d 1526, 1531 (5th Cir.1988). Despite the need to prove affirmative acts where the wrong is not "self-concealing," such proof is no tall order in most price fixing cases. In pleading/proving affirmative acts of concealment in this circuit, it is not necessary for the fraudulent concealment to be wholly separate from the wrong itself. Stated differently, there is no requirement for the acts of concealment to be independent of the conspiracy. *Allan Construction Co.,* 851 F.2d at 1532. Fraudulent concealment can be shown where the acts of concealment are intertwined with the acts of price fixing. *Allan Construction Co.,* 851 F.2d at 1531; *Greenhaw v. Lubbock County Beverage Ass'n,* 721 F.2d 1019, 1030 (5th Cir.1983).[16] Proof of fraudulent concealment is found with any evidence of efforts designed to keep price fixing activities secret. *Allan Construction Co.,* 851 F.2d at 1532; *Greenhaw,* 721 F.2d at 1030; 2 Areeda & Turner, *Antitrust Law,* para. 325d, at 124.

■ Returning now to the facts as alleged in the pleadings for the case *sub judice,* the court finds that the plaintiffs have alleged a pattern of conduct by the defendants which included face-to-face meetings and telephone calls—all conducted under the cloak of secrecy in furtherance of the conspiracy to fix the price of catfish. Such conduct of clandestine meetings and telephone conversations, if proven, is sufficient to establish the requisite "affirmative acts" of fraudulent concealment.

■ The application of fraudulent concealment is not complete without a discussion of the "due diligence" requirement. In order to avail the doctrine of fraudulent concealment and its equitable tolling of the statute of limitations, the plaintiffs must show that they failed, despite the exercise of due diligence on their part, to discover the facts that form the basis of their price fixing claim. "[T]he statute of limitations is tolled only until such time as the plaintiff, exercising reasonable diligence, could have discovered the facts forming the basis for the claim." *Allan Construction Co.,* 851 F.2d at 1533. The plaintiffs need not have actual knowledge of the facts before the duty of due diligence arises; rather, knowledge of certain facts which are "calculated to excite inquiry" give rise to the duty to inquire. *Allan Construction Co.,* 851 F.2d at 1533; *In re Beef Antitrust Litig.,* 600 F.2d 1148, 1171 (5th Cir.1979); *Clement A. Evans & Co., Inc. v. McAlpine,* 434 F.2d 100, 102 (5th Cir.1970). *cert. denied,* 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971). The statute of limitations begins to run once plaintiffs are on inquiry that a potential claim exists. *United Klans of America v. McGovern,* 621 F.2d 152, 154 (5th Cir.1980); *Prather v. Neva Paperbacks, Inc.,* 446 F.2d 338, 341 (5th Cir. 1971).

■ Plaintiffs assert that as soon as the duty of due diligence was triggered, they acted with deliberate speed. Specifically, plaintiffs allege that they learned of the conspiracy only after January 14, 1992, when the United States Department of Justice, Antitrust Division, filed an Information against Magnolia Processing alleging conspiracy to eliminate competition in the catfish industry by fixing prices. Hence, plaintiffs argue that prior to January of 1992, they had no knowledge of the combination and conspiracy; and, therefore, a due diligence duty did not arise until that time.

In any event, whether plaintiffs' duty was triggered before or immediately after January 1992, is a question of fact that need not and should not be decided on a motion to dismiss. *See Vanderboom v. Sexton,* 422 F.2d 1233, 1241 (8th Cir.1970). The court finds that the pleadings are more than sufficient in this regard. In paragraphs 38 and 39, the plaintiffs assert that because of the

---

**16.** *Greenhaw* was later overruled on an issue unrelated to its fraudulent concealment analysis.

*International Woodworkers v. Champion International Corp.,* 790 F.2d 1174, 1181 (5th Cir.1986).

secret, conspiratorial nature of defendants' conduct, plaintiffs and other potential members of the class did not know, and could not have known by the exercise of reasonable diligence, of the price fixing scheme prior to January, 1992. Furthermore, paragraph 40 alleges that when distributors inquired of the processors as to why the price of catfish and catfish products continued to rise in the 1980s, the processors attributed higher prices to increasing kill costs, price increases by farmers, shortages of large fish, and the "off flavor" problem.

In conclusion, the court denies defendants' motions to dismiss in their entirety for the reasons set forth above. The court finds no merit to the motions to dismiss which are based upon Rule 12(b)(6) and 9(b). Plaintiffs have made legally sufficient allegations of a conspiracy and have pled fraudulent concealment with the requisite degree of particularity that the law requires. The undersigned now proceeds with a discussion of plaintiffs' motion to certify a class. An appropriate Order in regard to the motions to dismiss will accompany this memorandum opinion.

## PLAINTIFFS' MOTION TO CERTIFY CLASS

Pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, the named plaintiffs have filed a motion to certify a class action on the behalf of:

All purchasers of processed catfish and catfish products in the United States who at any time during the period 1981 through at least 1990 directly purchased processed catfish and catfish products from one or more of the defendants (but excluding from the class defendants, their parents, subsidiaries, affiliates and governmental entities).

In support of the motion for class certification, the named plaintiffs have submitted a consolidated memorandum of law with accompanying affidavits and exhibits. Defendants Delta Pride, Farm Fresh, and ConAgra/Country Skillet have each submitted separate memorandums in opposition to plaintiffs' motion for class certification.

Rule 23(a) establishes four requirements for class certification which must be met before consideration of certification under Rule 23(b)(2) or (b)(3). Rule 23, in pertinent part, provides as follows:

(a) **Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) **Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\* \* \* \* \* \*

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Plaintiffs' action may be certified as a class action only if the court finds that it meets all requirements of Rule 23(a)(1)–(4), "numerosity," "commonality," "typicality," and "adequacy;" and, Rule 23(b)(3)'s additional re-

quirements of "predominance" of common questions and "superiority" of the class method for the fair and efficient adjudication of the controversy are also satisfied. As a counterpart to plaintiffs' section 16 claim of the Clayton Act, certification is also sought under (b)(2)—certification for purposes of appropriate injunctive relief with respect to the class as a whole.

In ruling upon a motion for class certification, the substantive allegations contained in plaintiffs' complaint are accepted as true. *Blackie v. Barrack,* 524 F.2d 891, 901 n. 17 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *In re Energy Systems Equipment Leasing Securities Litig.,* 642 F.Supp. 718, 724 (E.D.N.Y. 1986). However, the court does not delve into the merits of plaintiffs' substantive claims in ruling upon such a motion. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732, 748 (1974); *Transamerican Refining Corp. v. Dravo Corp.,* 130 F.R.D. 70, 76 (S.D.Tex.1990); *In re Energy Systems Litig.,* 642 F.Supp. at 724; *In re Scientific Control Corp. Securities Litig.,* 71 F.R.D. 491, 505 (S.D.N.Y.1976); *Steinmetz v. Bache & Co.,* 71 F.R.D. 202, 204 (S.D.N.Y.1976). Likewise, a predetermination of the merits of the defense of the suit is also inappropriate. *Philadelphia Elec. Co. v. Anaconda American Brass, Co.,* 43 F.R.D. 452, 458 (E.D.Pa.1968); *Siegel v. Chicken Delight Inc.,* 271 F.Supp. 722, 726 (N.D.Cal. 1967); 3B *Moore's Fed.Prac.* (MB) para. 23.-46. "The invitation to pre-try the case through the vehicle of this motion [class certification] must be respectfully declined...." *Siegel,* 271 F.Supp. at 726. Rather, the court's focus on a class certification motion is strictly upon the requirements as articulated in Rule 23.

With the exception of the numerosity requirement of Rule 23(a)(1), the various defendants register some objection, in varying degrees, to the remaining elements of Rule 23(a); commonality, typicality, and adequacy. However, the force of defendants' opposition is found in Rule 23(b)(3)'s requirement that questions of law or fact common to members of the class predominate over questions which would be applicable to individual members (i.e., predominance). Additionally, defendants attack the asserted predominance of a common impact and injury that a price fixing conspiracy in the catfish industry would cause. Beginning with the elements of Rule 23(a)(1–4), the court now examines plaintiffs' consolidated motion and defendants' objections.

### Rule 23(a)

#### Numerosity

The requirement of numerosity is fulfilled when the potential class is so numerous that joinder of all members is impracticable. F.R.C.P. 23(a)(1). As noted above, numerosity is the only element of Rule 23(a) which is uncontested. In plaintiffs' memorandum brief, plaintiffs allege that the direct purchasers of processed catfish and catfish products from the defendants during the period 1981 through 1990, consist of "several thousand" purchasers. Country Skillet and Delta Pride acknowledge that a potential class could include "thousands" of members. Suffice it to say that the potential number of class members is more than sufficient to justify class treatment.[17]

#### Commonality of Fact and Law

The second step of Rule 23(a) application calls for an inquiry into whether there are questions of law or fact common to the class. The issue of "commonality" is the target of defendants' primary opposition to the class certification motion. However, the force of defendants' opposition is tailored on the "predominance" (or lack thereof) of common questions of fact and law—which is a consideration for 23(b)(3) application, assuming all elements of 23(a) are met. Out of necessity, the court recognizes that any discussion of 23(a) commonality is likely to involve considerable overlap with 23(b)(3).[18]

---

**17.** *See In re Plywood Anti–Trust Litigation,* 76 F.R.D. 570, 578 (E.D.La.1976) (numerosity satisfied when potential class size is "thousands").

**18.** A leading treatise on the Federal Rules of Civil Procedure refers to Rule 23(a)(2)'s requirement of commonality as "unnecessary" in light of 23(b):

Nonetheless, the court perceives that the issues of "commonality" and "predominance" of common issues are separate considerations which play distinct roles in the class certification process.

Plaintiffs' consolidated complaint alleges a conspiracy among the defendant catfish processors with the illegal object of fixing, implementing, and maintaining the prices of processed catfish and processed catfish products at artificial, supracompetitive levels. As a means to this end, it is alleged that defendants participated in various face-to-face, "clandestine" meetings and telephone conversations wherein decisions about price fixing were made, as well as discussions about implementation. Obviously, any proof regarding the existence of meetings, telephone conversations, or any other means of communication, regarding price fixing in the catfish industry would be applicable to the class as proposed by the plaintiffs. Other elements of common proof are a logical extension from the same set of facts, if proven. For example, any evidence which may be introduced concerning the content and substance of discussions and decisions which might have been made at these alleged meetings are of common interest and an important concern to the entire class. It naturally follows that the proof, if any, which might unfold at trial would impact the application of the elements of a section 1 Sherman Act claim in the same manner as to all class members. Therefore, the presence of common questions of law are a direct and logical counterpart to the underlying set of facts in the alleged catfish price fixing scheme. Stated differently, all class members share a unity of interest in how the facts, as such will unfold at trial, will "fit" the law of a Sherman Act violation. Rule 23(a)(2) is satisfied since all the members of a class, as defined by named plaintiffs, have a potential interest in any proof of a concerted action, conspiracy, agreement, etc., with the aim of restraining trade in the catfish industry by fixing the prices of processed catfish and catfish products. Antitrust price fixing

conspiracies, by their nature, raise common questions of fact and law about the existence, scope, and effect of the alleged conspiracy. *Coleman v. Cannon Oil Co.*, 141 F.R.D. 516, 521 (M.D.Ala.1992); *Davis v. Northside Realty Associates, Inc.*, 95 F.R.D. 39, 43 (W.D.N.Y.1982); *In re Corrugated Container Antitrust Litig.*, 80 F.R.D. 244, 247 (S.D.Tex. 1978); *In re Sugar Industry Antitrust Litig.*, 73 F.R.D. 322, 335 (E.D.Pa.1976). Plaintiffs in this case have alleged a single conspiracy spanning a period of approximately nine years by the major players in the catfish processing industry. If each class member proceeded individually, each would have to prove the existence and impact of the identical conspiracy to fix prices. Obviously, individual actions designed to prove identical elements would completely destroy any notions of judicial economy. Hence, there are common issues of fact and law which favor class certification.

*Typicality*

A class action may be maintained only if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." F.R.C.P. 23(a)(3). The requirement of "typicality" lends itself to considerable overlap with 23(b)(3), commonality, and 23(a)(4), adequacy of the class representatives. 3B *Moore's Fed.Prac.* (MB) para. 23.06–2. However, there are some considerations which are exclusively generic to 23(a)(3) typicality. The most prominent consideration is that there is an absence of an adverse interest between the representative parties and other members of the class. *Tidwell v. Schweiker*, 677 F.2d 560, 566 (7th Cir.1982), *cert. denied*, 461 U.S. 905, 103 S.Ct. 1874, 76 L.Ed.2d 806 (1983); *Blake v. Arnett*, 663 F.2d 906, 913 (9th Cir.1981); *Fowler v. Birmingham News Co.*, 608 F.2d 1055, 1058–59 (5th Cir.1979); *Scott v. University of Delaware*, 601 F.2d 76, 85 (3d Cir.1979); *In re Arthur Treacher's Franchisee Litig.*, 92 F.R.D. 398, 425–26 (E.D.Pa. 1981). Certainly, typicality does not mean that the claims of class members must be

"[A]n action can be maintained as a class action under Rule 23 only if it also satisfies the requirements of at least one of the three types of class actions provided for by subdivision (b), and a finding that common questions exist is

implicitly required by a finding under either subdivisions (b)(1), (fn omitted) (b)(2), (fn omitted) or (b)(3) (fn omitted)."
3B *Moore's Fed.Prac.* (MB) para. 23.06–1.

identical. *Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985); *Kornberg v. Carnival Cruise Lines, Inc.,* 741 F.2d 1332, 1337 (11th Cir.1984), *cert. denied,* 470 U.S. 1004, 105 S.Ct. 1357, 84 L.Ed.2d 379 (1985); *De La Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983); *Kennedy v. Tallant,* 710 F.2d 711, 717 (11th Cir.1983); *Milonas v. Williams,* 691 F.2d 931, 938 (10th Cir.1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983); *Phillips v. Joint Legislative Committee on Performance and Expenditure Review (PEER) of the State of Mississippi,* 637 F.2d 1014, 1024 (5th Cir. 1981), *cert. denied,* 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 483 (1982); *Coleman v. Cannon Oil Co.,* 141 F.R.D. 516, 522 (M.D.Ala.1992); *Bishop v. New York City Dept. Of Hous. Pres. & Dev.,* 141 F.R.D. 229, 238 (S.D.N.Y.1992). Beyond the absence of an adverse interest between the representatives and the class members, a claim by a representative party may be deemed "typical" if it is one which should be "reasonably expected" to be raised by members of the proposed class. *Technograph Printed Circuits, Ltd. v. Methode Electronics, Inc.,* 285 F.Supp. 714, 721 (N.D.Ill.1968). Furthermore, in instances wherein it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members. *Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985); *Cumberland Farms Inc. v. Browning–Ferris Industries, Inc.,* 120 F.R.D. 642, 646 (E.D.Pa. 1988); *In re U.S. Financial Securities Litig.,* 69 F.R.D. 24, 35 n. 12 (S.D.Cal.1975); *Frankford Hospital v. Blue Cross of Greater Philadelphia,* 67 F.R.D. 643, 646 (E.D.Pa.1975).

■ Defendant Country Skillet/ConAgra asserts that the representative plaintiffs are a diverse assortment of catfish purchasers who are not at all typical of a broad class of absent class members. In essence, Country Skillet asserts that named plaintiff diversity destroys typicality. As the following descriptions demonstrate, the named plaintiffs are a diverse group; however, the court does not accept defendants' claims that their diversity is a poor reflection of the typical claims of absent class members.

*State Fish Distributors, Inc.,* is an Illinois corporation with its principal place of business in Chicago. During the 1980s, State Fish bought an average of 40,000 to 50,000 pounds of processed catfish per week. Purchases were made from ConAgra, Farm Fresh, Delta Pride and Southern Pride. State Fish also buys seafood, but processed catfish filets, nuggets, and processed whole catfish comprise approximately 50%–75% of State Fish's purchase of fish. State Fish has approximately 10–12 employees, and its customers are primarily restaurants, wholesalers, and retailers in the Chicago area, along with some customers in Detroit. State Fish requires that the processors deliver whole processed catfish with a layer of paper between the fish and the packing ice in order to conserve freshness of the product.

*American Seafood, Inc.,* is a New Orleans, Louisiana, food distributor that purchased approximately 1500 pounds of catfish per week, almost exclusively from Delta Pride. American Seafood is a small firm which services New Orleans restaurants, ships, and hotels. American Seafood primarily purchases catfish filets and catfish nuggets.

*Randle Trout Distributors Inc.,* is a corporation that has its principal place of business in Renton, Washington. Randle Trout's customers are located in the Seattle area; and catfish filets, ice packed and frozen, comprise approximately 30%–40% of Randle Trout's purchases. Randle Trout has purchased almost exclusively from Delta Pride, although it did buy some catfish from Farm Fresh for a brief time.

*Robert Orr–Sysco Food Services Co.,* is a Tennessee corporation with its principal place of business in Nashville. Robert Orr–Sysco, a subsidiary of Sysco Corporation, is a large food service distributor. Robert Orr–Sysco employs approximately 700 employees and operates out of a 230,000 square foot distribution facility in Nashville. Robert Orr–Sysco markets in a six state area, and several of its customers are institutional purchasers, such as hospitals, hotels, and schools. Other customers include grocery stores, restaurants, and some retail outlets. The bulk of Robert Orr–Sysco's purchases

include frozen whole fish and catfish filets. On an average of twice per week, Robert Orr–Sysco purchased catfish from Delta Pride, ConAgra, and Country Skillet. Robert Orr–Sysco is a large volume purchaser, and it distributes catfish to its customers under some of its own private labels, such as Hermitage and Sysco. The defendant processors package the catfish for Robert Orr–Sysco under the company's private label brands, although some catfish products are sold under the processors' own label.

*Farm House Food Distributors, Inc.,* is an Ohio corporation with its principal place of business in Cleveland. Farm House has approximately 35 employees, and its sales are within the Cleveland area. Farm House has purchased frozen filets from Country Skillet, Delta Pride and Farm Fresh. In addition to a wide variety of fish, Farm House's retail sales also include paper goods, grocery items, poultry and meat. Farm House purchased catfish on a monthly basis, and a substantial volume of its catfish purchases were of "wild" catfish rather than farm raised catfish supplied by the defendants.

The court is not persuaded that the diversity which exists among the named plaintiffs should, in some way, diminish or destroy the typicality requirement of Rule 23(a)(3). Collectively, the plaintiffs are typical purchasers, and their diversity can only strengthen their ability to represent absent class members that vary in size, geographical location, and buying patterns. The tailored focus on a typicality inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct which is not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct. *Dura–Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 99 (S.D.N.Y.1981). The fact that some distributors bought more catfish than others, that some liked their catfish shipped on a layer of paper, that some catfish products arrived at the distributor under a private label, etc., is not the sort of diversity which destroys typicality. The claims of the named plaintiffs are typical since they are based upon an identical theory of an alleged conspiracy to fix prices in the catfish industry and injury as a consequence thereof. Further, nothing has been brought to the court's attention which would suggest an antagonistic interest between the named plaintiffs and other class members.

There has been general agreement that the existence of varying fact patterns to support the claims of individual class members does not mandate a finding of a lack of typicality, as long as the claims arise out of the same legal or remedial theory. *Christy v. Hammel,* 87 F.R.D. 381 (M.D.Pa.1980); *In re South Central States Bakery Products, supra.* Since the claims here are based on what appears to be the identical theory and since there are no demonstrated antagonistic interests between the representative parties and the class members, the typicality requirement is satisfied.

*In re Alcoholic Beverages Litig.,* 95 F.R.D. 321, 324 (E.D.N.Y.1982). As noted above, there is nothing in Rule 23(a)(3) which requires named plaintiffs to be clones of each other or clones of other class members. The diversity of named plaintiffs who differ in their methods of operation and conduct is often cited by defendants as an impediment to class certification. However, as long as the substance of the claim is the same as it would be for other class members, then the claims of named plaintiffs are not atypical. *See In re Domestic Air Transp.,* 137 F.R.D. 677, 699 (N.D.Ga.1991) (named plaintiffs' claims stem from same legal theory as class claims notwithstanding that class members purchased tickets at different prices and according to varying conditions); *In re Wirebound Boxes Antitrust Litig.,* 128 F.R.D. 268, 270 (D.Minn.1989) (where representatives had to prove existence, scope, and impact of alleged nationwide conspiracy, such claims were sufficiently typical of entire class); *United Nat. Records, Inc. v. MCA, Inc.,* 99 F.R.D. 178, 181 (N.D.Ill.1983) (while product diversity might impact amount of recoverable damages, it does not negate typicality since all class members share same claim resulting from alleged conspiracy); *In re McDonnell Douglas Corp. Sec. Litig.,* 98 F.R.D. 613, 619 (E.D.Mo.1982) (typicality is met if claim of named plaintiff arises from same act or course of conduct that comprises

basis of claims for other class members); *In re Glassine & Greaseproof Paper Antitrust Litig.*, 88 F.R.D. 302, 304 (E.D.Pa.1980) ("Typicality is not destroyed because a representative's claim presents a somewhat different factual pattern."); *In re South Central States Bakery Products*, 86 F.R.D. 407, 415 (M.D.La.1980) (factual variations do not destroy typicality where all purported class members must establish same elements of price fixing claim; existence, scope, efficacy); *Hedges Enterprises, Inc. v. Continental Group*, 81 F.R.D. 461, 467 (E.D.Pa.1979) (defendant's claim that small size of representative plaintiff's firm was atypical in comparison to other "Fortune 500" claimants was meritless); *Minnesota v. United States Steel Corp.*, 44 F.R.D. 559, 566 (D.Minn.1968) (claims of eight representative parties were typical since proof of conspiracy and price fixing were common to all notwithstanding defendants' argument that claims were atypical because of diverse methods of procuring and producing fabricated steel). Finding that the claims of the named plaintiffs are typical of other class members, the court now proceeds to 23(a)(4) which provides that the representative parties must fairly and adequately protect the interests of the class.

*Adequacy*

 Adequate representation turns upon the qualifications and experience of plaintiffs' counsel to conduct the litigation and whether the plaintiffs have any interests antagonistic to the class. *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679; *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 186 (N.D.Ill.1992); *Equal Employment Opportunity Commission v. Printing Industry of Metropolitan Washington, D.C., Inc.*, 92 F.R.D. 51, 54 (D.D.C.1981). In the case *sub judice*, there is no serious suggestion that plaintiffs' attorneys are anything other than very capable, experienced antitrust counsel. Hence, the defendants take aim at the repre-

sentative parties and argue that the five named plaintiffs are inadequate, poor representatives for the class. Specifically, defendants attempt to demonstrate that the class representatives are "in the dark" about the scope and objectives of this litigation and are mere pawns in the hands of antitrust counsel.[19] In the absence of a full understanding of the litigation's purpose, defendants assert that the representative parties are poor choices to look out for the interests of their class member colleagues.

The court has reviewed the considerable volume of deposition testimony of the named plaintiff representatives which was submitted with Country Skillet/ConAgra's brief in opposition to the class certification motion. Upon review of the deposition testimony, the court does not accept defendants' assertions that the named plaintiffs are poor representatives for the class. An antitrust litigant is not expected to appreciate the finer points of the Sherman Act, Clayton Act, or the Federal Rules of Civil Procedure governing class action certification. "To require the class representative to be sophisticated and knowledgeable enough to help counsel in this quest would reduce the class action device, especially in complicated antitrust cases, to an impotent tool." *Chevalier v. Baird Sav. Ass'n*, 72 F.R.D. 140, 146 (E.D.Pa.1976). *See Hoffman Elec., Inc. v. Emerson Elec. Co.*, 754 F.Supp. 1070, 1077 (W.D.Pa.1991) (lack of personal knowledge about material facts of securities case is not indicative of inadequate representation); *Zinberg v. Washington Bancorp, Inc.*, 138 F.R.D. 397, 408 (D.N.J.1990) (no requirement pursuant to Rule 23 that named plaintiffs be totally aware of all facts concerning claims in issue); *Foltz v. U.S. News & World Report, Inc.*, 106 F.R.D. 338, 341 (D.D.C.1984) (class representatives are not required to possess detailed knowledge of their lawsuit); *Pellman v. Cinerama, Inc.*, 89 F.R.D. 386, 389 (S.D.N.Y. 1981) (plaintiff's unfamiliarity with securities fraud litigation considered "trivial").

**19.** For example, defendant Country Skillet/ConAgra alleges that one representative, an officer from Farm House, knew so little about the case that he appeared to believe that he was being deposed in conjunction with a criminal grand jury investigation. Based on this claim, the court reviewed this testimony with interest. Upon review of the testimony, the court disagrees that the witness was confused in any way or that he did not understand the purpose of the deposition.

Despite defendants' suggestion to the contrary, the court perceives nothing remarkable about the representatives' knowledge and understanding of their undertaking as class action representatives in this antitrust suit. Having stated that, the court hastens to add that the undersigned will be monitoring the adequacy of party representation for absent class members as the litigation progress; and, the court will respond accordingly where it perceives instances where active judicial involvement is in the best interest of this litigation. The court is aware of the popular criticism and perception of class action litigation as being a lifeline for legal fees rather than a judicially feasible approach to vindicate multiple wrongs. Regardless of whether such criticism is fact or myth, it goes without saying that the client's interest is first and foremost in the advocacy of this case and in every case. With that stated, the court finds that the class representatives in this litigation are quite adequate.

All four prerequisites of Rule 23(a) are satisfied in this case. Consequently, the court's attention turns to Rule 23(b) for an assessment of the criteria which is set forth on the maintainability of class actions. As noted above, the sum and substance of defendants' opposition to class certification is predicated on a assertion that the litigation in the case *sub judice* can not satisfy Rule 23(b)(3) standards.

### *Rule 23(b)*

Plaintiffs have moved for class certification under 23(b)(2) and 23(b)(3). Rule 23(b)(2) certification is appropriate for equitable, injunctive relief, while 23(b)(3) certification sets forth another stage of class certification criteria.

**(b) Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\* \* \* \* \* \*

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

F.R.C.P. 23(b).

■ The defendants launch a well armed defensive strategy with the aim of convincing the court that the catfish processing industry is a highly diverse, fragmented industry which is totally incapable of price fixing, or producing any predominating result or consequence. In the effort to defeat (b)(3) certification, the defendants' arsenal includes the opinions of two expert economists[20] who have offered their opinions and statistical analysis on every A–Z consideration in the catfish processing and marketing industry. Likewise, plaintiffs are equipped with their own expert economist[21] who can refute every opinion, every chart, and every statistic served by the defendants. The court has carefully reviewed all of the affidavits, deposition testimony and exhibits submitted by all three economists. Some of it was helpful to

---

**20.** Mr. Michael L. Glassman of Glassman–Oliver Economic Consultants, Inc., Washington, D.C. Dr. Gordon Rausser, University of California at Berkeley; Law and Economics Consulting Group, Inc., Berkeley, California.

**21.** Dr. John C. Beyer, Nathan Associates, Inc., Arlington, Virginia.

the court in the consideration of the class certification motion, but most of it was not.[22]

In reviewing the motion for class certification under the guidelines of Rule 23(b)(3),[23] there appear to be four issues which would logically influence whether or not questions of law or fact common to the class predominate over individual questions and whether the class approach is superior to other methods of adjudication. Plaintiffs and defendants have also identified the following issues as crucial to the "predominance, superiority, manageability" questions: (a) whether evidence of the conspiracy is common to the class; (b) whether evidence of impact and damage is common to the class; (c) if liability is established, does an acceptable mechanism exist for the determination of damages; (4) does the fraudulent concealment issue present a common predominant question for the proposed class. The court's conclusions as to these four issues will, out of necessity, provide insight into the manageability of a class action and the other pertinent considerations of Rule 23(b)(3)(A–D).

As a rule of thumb, a price fixing antitrust conspiracy model is generally regarded as well suited for class treatment. 3B *Moore's Fed.Prac.* (MB) para. 23.46. The guiding principle for b(3) certification is that the interests of the parties can best be served by settling their differences in one single action. 7A Charles A. Wright & Arthur R. Miller, *Fed.Prac. and Proc.* § 1777 (1986). However, a mere charge of conspiracy does not mean that common questions predominate, or that product or market diversity, or dissimilar treatment could render a class action unmanageable. The suitability for Rule 23 certification is, by design and necessity, a fact sensitive process for each case.

*Evidence of A Conspiracy Common to The Class*

In the case *sub judice,* the court first considers whether evidence of the conspiracy is common to the class. Evidence of a national conspiracy to fix the prices of catfish and processed catfish products would revolve around what the defendants did, and said, if anything, in pursuit of a price fixing scheme. While ownership of catfish processing facilities is geographically diverse in this country, the location and principal places of catfish processing are not. For the most part, the facilities are located in Mississippi and Alabama. In support of their motion for class certification, plaintiffs have submitted the affidavits of Joseph Glover, Jr., President of Southern Pride, and William H. Gidden, President of Magnolia Processing. Mr. Gidden's affidavit refers to at least three meetings in Mississippi with competitors in the catfish processing business and a number of telephone conversations. Mr. Glover's affidavit refers to "numerous conversations with my competitors" about price fixing in the catfish industry. If proven, evidence of any meetings in Mississippi, telephone conversations, or other electronic communications in pursuit and furtherance of the alleged conspiracy would be the most relevant evidence that could be introduced in proving the allegations of plaintiffs' complaint of price fixing. The court does not perceive that evidence of this type would be particular or isolated as to any individual plaintiff. Rather, such evidence would be pertinent and common to all plaintiffs. *See In re Domestic Air Transp.,* 137 F.R.D. 677, 689 (N.D.Ga.1991) (evidence of conspiracy resulted from "common nucleus of operative facts"); *Transamerican Refining Corp. v. Dravo Corp.,* 130 F.R.D. 70, 75 (S.D.Tex.1990) (proof of conspiracy susceptible to generalized proof since focus is on what defendants did and said); *In re South Central States Bakery Products,* 86 F.R.D. 407, 419 (M.D.La.1980) (court rejected claim that wholesale bakery business was too complex for generalized proof of antitrust con-

---

**22.** Some of the research was organized into a useful format for the court's consumption, but much of it contained some rather bold assertions regarding the merits of plaintiffs' Sherman Act claim. As previously noted, the court takes great pains to caution that a peek into the merits at this stage is very premature and wholly inappropriate. The court is merely interested in the legal criteria for the motions to dismiss and motion for class certification, which are quite specific. It follows then that the court finds no purposeful use for the expert economist conclusions concerning the merits of the case.

**23.** The court recognizes that 23(b)(3) factors for class certification will result in some overlap with 23(a) considerations.

spiracy). Claims of geographical complexity and product diversity are often asserted as a bar to the predominance analysis of common questions in class certification efforts. *See e.g., In re Domestic Air Transp.,* 137 F.R.D. 677 (N.D.Ga.1991); *In re Wirebound Boxes Antitrust Litig.,* 128 F.R.D. 268 (D.Minn. 1989); *Fisher Bros. v. Mueller Brass Co.,* 102 F.R.D. 570 (E.D.Pa.1984); *In re Alcoholic Beverages Litig.,* 95 F.R.D. 321 (E.D.N.Y. 1982); *In re Screws Antitrust Litig.,* 91 F.R.D. 52 (D.Mass.1981); *In re Glassine & Greaseproof Paper Antitrust Litig.,* 88 F.R.D. 302 (E.D.Pa.1980); *Hedges Enterprises, Inc. v. Continental Group,* 81 F.R.D. 461 (E.D.Pa.1979); *In re Corrugated Container Antitrust Litig.,* 80 F.R.D. 244 (S.D.Tex.1978); *Shelter Realty Corp. v. Allied Maintenance Corp.,* 75 F.R.D. 34 (S.D.N.Y.1977); *In re Folding Carton Antitrust Litig.,* 75 F.R.D. 727 (N.D.Ill.1977); *In re Sugar Industry Antitrust Litig.,* 1977–1 Trade Cas. (CCH) para. 61,373 (N.D.Cal. 1976); *In re Master Key Antitrust Litig.,* 70 F.R.D. 23 (D.Conn.1975). Furthermore, the court is not persuaded that *State of Alabama v. Blue Bird Body Co., Inc.,* 573 F.2d 309 (5th Cir.1978), supports defendants' argument that complexity in the catfish processing industry defies the feasibility of class certification. *Blue Bird* concerned a price fixing scheme by the manufacturers and distributors of school bus bodies. The Fifth Circuit affirmed the district court's certification of a class of Alabama school bus purchasers; however, the trial court's certification of a national class of school bus purchasers was premature since plaintiffs had failed to establish that, as to the proposed national class, common issues predominated over individual issues. *Blue Bird,* 573 F.2d at 321. "The district court's error in certifying this nationwide class for a determination of liability was in failing to take the steps necessary to determine the manner in which the plaintiffs proposed to prove the antitrust violation." *Id.* In *Blue Bird,* the evidence before the court in the class certification stage only

presented the possibility of an Alabama conspiracy. There was nothing to suggest that the conspiracy touched and concerned school bus purchasers outside of Alabama, and the court was unable to determine if plaintiffs intended to proceed state-by-state to establish the existence of a conspiracy in each school bus market.[24] *Id.* This is not the situation in the case *sub judice.* Here, the allegations and proposed proof address one national conspiracy by the processors which are localized in Mississippi and Alabama. The case does not entail a segmented approach, state-by-state or market-by-market, to establish whether or not a conspiracy existed.

Additionally, the court is not convinced that regional taste preferences for catfish is the type of diversity which diminishes the predominance of common questions. While catfish is processed as the whole fish, fileted, halved, frozen, packed on ice, cut into steaks, strips, nuggets, shanked, breaded, or marinated in lemon, butter, barbecue, or mesquite, etc., such product diversity does not exclude the sum and substance of plaintiffs' allegations—that the major players in the industry engaged in clandestine activities to fix and maintain prices at higher, artificial levels. Generalized proof of a conspiracy is common to all potential plaintiffs despite their individual tastes and preferences. An alleged conspiracy to fix the price which was charged is the unifying force and the predominant, overriding question.

*Is Evidence of Impact and Damage Common to The Class?*

The food distributors contend that as a result of agreements to establish and adhere to minimum prices for certain catfish products, the prices which the processors charged were artificially high and at noncompetitive levels. Therefore, each plaintiff experienced the impact of the same type of injury by paying more for catfish products than what would have existed in a truly competitive environment. Plaintiffs allege that a conse-

**24.** There are substantial differences in the way in which school districts purchase school buses. State product specifications and bidding procedures which are set by state law demand local, individualized inquiries into the various markets. *Blue Bird,* 573 F.2d at 313. However, the Fifth

Circuit did not foreclose the possibility of certification of a national class. Instead, the case was remanded to the district court to allow plaintiffs an opportunity to establish the proper predicate of predominance of common questions over individual issues. *Blue Bird,* 573 F.2d at 323.

quence of the alleged conspiracy is that the artificial minimum price became the benchmark from which catfish prices were negotiated or discounted. *See In re Domestic Air Transp.,* 137 F.R.D. 677, 689 (N.D.Ga.1991) (inflated fares resulted in artificial "base" price which became benchmark for discounted or negotiated fares); *Hedges Enterprises, Inc. v. Continental Group, Inc.,* 81 F.R.D. 461, 475 (E.D.Pa.1979) (despite negotiated or discounted prices, artificial minimum became "base" price). In an illegal price fixing scheme, there is a presumption that all purchasers will be impacted/injured by having to pay the higher price. *In re Alcoholic Beverages Litig.,* 95 F.R.D. 321, 327 (E.D.N.Y. 1982); *In re Cement and Concrete Antitrust Litig.,* 1979–1 Trade Cases para. 62,502, 1979 WL 1595 (D.Ariz.1979); *In re Plywood Antitrust Litig.,* 76 F.R.D. 570, 584 (E.D.La. 1976); *In re Master Key Antitrust Litig.,* 528 F.2d 5, 12 n. 11 (2d Cir.1975).

As a result of statistical analyses performed on computerized price data furnished by the defendants, Dr. John C. Beyer, plaintiffs' expert economist, concluded that there is a structure to prices in the catfish processing industry. According to Dr. Beyer, catfish product prices are strongly related to one another over time, and there is a strong correlation between product prices and the prices of live fish, sometimes referred to as the "bank price."

A correlation coefficient is a statistical measure of the degree of association between two variables. The closer the coefficient is to one (1), the variables are more strongly related and reflect a stronger systematic relationship.[25] In his second affidavit, Dr. Beyer responded to criticism from defendants' economists (Glassman and Rausser) and explained his findings with regard to stable, systematic relationships of catfish product prices to the prices of live fish:

22. The extensive body of computerized price data that defendants recently provided demonstrates that there is a structure to prices in the catfish processing industry, that catfish product prices are strongly related to one another over time, and that catfish product prices have strong, stable,

and mutually consistent relationships to the price of live fish. There is similarity rather than diversity among the catfish prices analyzed by Mr. Glassman and Dr. Rausser.

\*　　\*　　\*　　\*　　\*　　\*

24. Chart A on the following page, utilizing Mr. Glassman's average monthly prices for Delta Pride, portrays the very stable relationship between the price of live fish and the price of fresh shank fillet and fresh whole catfish. From the earliest currently available data (April 1985) to the most recent (May 1992), a span of **over seven years,** shank fillet has remained a **stable** $2.00 per pound above the price of live fish, and processed whole fish has remained a stable $1.00 per pound above the price of live fish. Of course, the margins are seldom **exactly** $2.00 and $1.00; the relationship in average monthly prices varies from month to month. However, this month-to-month variation does not obscure the true underlying relationship among the prices—a stable relationship for more than seven years. There is a strong correlation (.91) between the price of live fish and the price of fresh whole fish, and there is also a strong correlation (.90) between the price of live fish and the price of fresh shank fillet.

25. The same stable relationship between live fish and fresh whole catfish and fresh shank fillet is also reflected in Country Skillet prices, as shown in Chart B. These relationships hold true no matter what scale is used for these charts.

26. As shown in Chart C, the correlation between live fish and frozen whole catfish is .91, and the correlation between live fish and frozen shank fillet is .88. The relationships between fresh and frozen whole and shank prices to one another and to live fish prices are thus mutually consistent and stable.

In the court's opinion, Dr. Beyer's expert conclusion is significantly buttressed by the non-expert statements of Mr. Gidden and Mr. Glover. In his affidavit, Mr. Glover,

---

**25.** Beyer Affidavit, para. 23 [fn 30].

President of Southern Pride, stated that the rule of thumb for pricing processed catfish is that whole fresh catfish is priced at $1.00 per pound over the bank price, and filets are priced at $2.00 per pound over the bank price. In the affidavit of William Gidden, President of Magnolia Processing, Mr. Gidden described some of the methods of the alleged price fixing scheme:

> [ ...] The prices stated were per pound prices for different products, such as fillets, strips, steaks, nuggets and whole fish. The prices and effective date were agreed upon by those present. I did not participate in any of the discussions about prices, but merely listened and observed. I don't remember specifically what prices were agreed upon, and I don't know how they were arrived at. I did hear later about a rule of thumb that prices for processed catfish should generally be the live bank price plus one dollar for whole fish and the live bank price plus two dollars for fillets.

Whether or not Dr. Beyer is correct in his assessment of common impact/injury is for the trier of fact to decide at the proper time. *In re Paoli R.R. Yard PCB Litig.,* 916 F.2d 829, 858 (3d Cir.1990); *In re Domestic Air Transp. Litig.,* 137 F.R.D. 677, 692 (N.D.Ga. 1991). For now, the court is persuaded that for the purposes of a class certification motion, plaintiffs have made a threshold showing that a price fixing conspiracy in the catfish processing industry, if proven, would have had a common impact for members of the proposed class. The court rejects the defendants' assertions that the catfish processing industry is too diverse, too complex, and too fragmented to effectively devise and implement a price fixing scheme.[26] Such an assertion flies in the face of common sense and the empirical data and analysis presented by Dr. Beyer. The court reaches this conclusion after a meticulous review of the

affidavits of the expert economists, their charts, explanations of economic behavior of catfish pricing, the non-expert affidavits of Glover and Gidden, and the arguments of counsel as submitted in their briefs.

*Measure of Damages*

The court's role at the class certification stage in assessing the proposed methods of proving damages is quite limited. The preliminary inquiry is whether or not the proposed methods are so insubstantial that they amount to no method at all. *In re Industrial Gas Antitrust Litig.,* 100 F.R.D. 280, 306 (N.D.Ill.1983). Furthermore, it is generally recognized that some relaxation of the plaintiff's burden of proving damages is tolerated once an antitrust violation and resulting damages have been established. *Graphic Products Distributors v. Itek Corp.,* 717 F.2d 1560, 1579 (11th Cir.1983); *In re Plywood Antitrust Litig.,* 655 F.2d 627, 635 (5th Cir. 1981); *Malcolm v. Marathon Oil Co.,* 642 F.2d 845, 858 (5th Cir.1981); *Hobart Bros. Co. v. Malcolm T. Gilliland, Inc.,* 471 F.2d 894, 903 (5th Cir.), *cert. denied,* 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150 (1973). The relaxation for the standard of proof in an antitrust case is a logical and natural result of a willingness to accept some measure of uncertainty due to the difficulty of ascertaining business damages. *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 566–67, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981); *Zenith Radio Corp. v. Hazeltine Research Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946). Obviously, certain knowledge of what plaintiff's position would have been in the absence of defendant's antitrust violation is never known. *J. Truett Payne Co.,* 451 U.S. 557, 566–67, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442. Hence, the willingness to accept some uncertainty stems

---

26. For one example, a number of theories are offered regarding the impact of a price fixing scheme wherein Delta Pride is allegedly a major participant. Since Delta Pride is a farmer-owned cooperative with a large share of the catfish market, Delta Pride is able to return profits from inflated prices to the member producers in the form of patronage rebates. Hence, defendants claim that Delta Pride's objectives in a price fixing scheme would be different from the

remaining defendants which are corporations motivated by the profit margin. The obvious difference exists in who "shares the wealth" as a result of inflated, artificial price levels. In the court's view, this distinction is of no significant consequence. In the plaintiffs' consolidated complaint, it is alleged that the price fixing conspiracy in the catfish food chain existed in the processor-distributor link, *not* producer-processor.

from a simple, equitable notion that the wrongdoer should not be allowed to profit by an insistence upon an unattainable standard of proof.

In his first affidavit, Dr. Beyer explains that the measurement of damages involves a two step process. First, the amount of a percentage overcharge must be determined by which prices were artificially inflated because of the anticompetitive behavior. The second step is merely an arithmetical process in which the overcharge is applied to the class member's purchases. In order to determine the percentage overcharge in the first step, a benchmark price must be identified. The benchmark price is an estimation of what the price would have been absent the price fixing scheme, and Dr. Beyer explains three methods which might be used in determining a benchmark price and percentage overcharge.

37. One such approach would involve identifying a base catfish price during a period after the time the alleged conspiracy was affecting defendants' prices (if such a non-conspiracy period is determined to exist). Such an approach would use this base price to estimate processed catfish prices over time by applying various measures of the rates of defendants' cost changes and indices of other changes affecting prices that actually occurred over the damage period. Statistical techniques can be used to isolate the effects of various influences on price, thereby allowing a determination of the impact of any one of the variables, including in this case, the impact of the conspiracy. This approach was used successfully in a class-action antitrust matter involving corrugated containers.

38. A second approach would involve a study of individual catfish processing firm or industry profitability, and a determination of the rates of profit that would have existed absent the conspiracy, perhaps by way of comparison to similar industries. As noted above, however, care would have to be taken to ensure proper accounting of catfish profitability, allowing for the transfer of profits from processors to the catfish farmers via live fish prices.

39. A third approach would involve an econometric analysis of defendants' prices during the conspiracy—an analysis of how and why prices changed over time. Such insight may provide the ability to develop a benchmark of the price that would have existed for catfish products absent the alleged conspiracy. Some econometric studies of catfish pricing practices have already been conducted....

Beyer Affidavit, No. 1.

The proposed methods for determining damages, in the event that liability is established and the determination of damages is necessary, is not so insubstantial and illusive as to amount to no method at all. *See In re Industrial Gas Antitrust Litig.*, 100 F.R.D. 280, 306 (N.D.Ill.1983). As noted above, it is recognized that the calculation of business damages necessarily involves some acceptable retrospective estimations of what market behavior would have been, absent certain factors. While the calculation of damages may not be as simple as plaintiffs suggest, the court also doubts that the task would be as impossible as defendants assert. In any event, the approaches suggested by Dr. Beyer appear to be methods which were deemed acceptable in other antitrust litigation. *See In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 268, 272 (D.Minn.1989); *In re Corrugated Container Antitrust Litig.*, 80 F.R.D. 244, 251 (S.D.Tex.1978).

While an appropriate method for calculating damages may exist, the court also recognizes the obvious. That is, damage amounts are individualized and will vary among plaintiffs. Nonetheless, individual questions of damages are often encountered in antitrust actions, and they are rarely a barrier to certification. *In re Workers' Compensation*, 130 F.R.D. 99, 110 (D.Minn.1990). Separate mini-trials, the assistance of a special master, or some later stratification of the class may be utilized to help resolve the issue of damages. *Id.* The difficulties or challenges which may face the court in the damages phase of this litigation, should it proceed that far, are frail obstacles to certification when measured against the substantial benefits of judicial economy achieved by class treatment of the predominating, common issues. The

obstacle of individual damage assessments was placed in its proper perspective by the district court in *Shelter Realty*.

Finally, defendants contend that the question of damages will require individualized proof by absent class members, and that this is in itself sufficient to preclude class treatment. This point proceeds from the familiar proposition that proof of damages is part of the private antitrust plaintiff's cause of action. See, e.g., *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114, 89 S.Ct. 1562 [1572], 23 L.Ed.2d 129 and n. 9 (1969). But the conclusion outruns the premise. If defendants' argument were uncritically accepted, there would be little if any place for the class action device in the adjudication of antitrust claims. Such a result should not be and has not been readily embraced by the various courts confronted with the same argument. See, e.g., *In re Sugar Industry Antitrust Litigation, supra*, at p. 70,559 [73 F.R.D. 322]. Cf. *Green v. Wolf Corporation*, 406 F.2d 291, 301 (2d Cir. 1968), cert. denied, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). The predominance requirement calls only for predominance, not exclusivity, of common questions.

*Shelter Realty Corp. v. Allied Maintenance Corp.*, 75 F.R.D. 34, 37 (S.D.N.Y.1977). *See In re Fine Paper Antitrust Litig.*, 82 F.R.D. 143, 154 (E.D.Pa.1979) (issue of individual damages should not preclude class treatment where common issues of liability predominate).

### Fraudulent Concealment

Finally, the defendants argue that the fraudulent concealment issue would require individual proof from various class members, particularly with regard to the due diligence efforts set forth by each. The undersigned does not agree. Rather than demanding individualized proof of actions by various class members, the court perceives that questions common to the class would predominate the analysis of fraudulent concealment in determining the applicable statute of limitations. For example, any evidence of acts of concealment would be common to the class. Additionally, circumstances which would trigger the duty of due diligence would appear to be applicable to the class of food distributors who purchased catfish products from the processors. However, should events unfold to indicate that certain plaintiffs would fall subject to statutes of limitations not faced by other plaintiffs, then such differences can be ironed out in the separate proceedings to determine damages, if necessary. *See In re Plywood Antitrust Litig.*, 76 F.R.D. 570, 586 (E.D.La. 1976) (individualized aspects of statute of limitations can be adjudicated in same fashion and same time as individual damages). The court's finding that common issues would predominate over any individual considerations of fraudulent concealment is in accord with the great weight of authority which has considered the same question. *Town of New Castle v. Yonkers Contracting Co.*, 131 F.R.D. 38, 43 (S.D.N.Y.1990) (common questions pervade fraudulent concealment inquiry); *In re Wirebound Box Antitrust Litig.*, 128 F.R.D. 262, 272 (D.Minn.1989) (same); *Fisher Bros. v. Mueller Brass Co.*, 102 F.R.D. 570, 579 (E.D.Pa.1984) (same); *In re Screws Antitrust Litig.*, 91 F.R.D. 52 (D.Mass.1981) (same); *In re Glassine and Greaseproof Paper Antitrust Litig.*, 88 F.R.D. 302, 307 (E.D.Pa.1980) (same); *In re Fine Paper Antitrust Litig.*, 82 F.R.D. 143, 154–55 (E.D.Pa.1979) (same); *In re Independent Gasoline Antitrust Litig.*, 79 F.R.D. 552, 559 (D.Md.1978) (same).

In addition to the predominance of common questions, Rule 23(b)(3) certification calls upon the court to consider the manageability of a class action and whether or not the class action is superior to other methods of adjudication. F.R.C.P. 23(b)(3). Once it is determined that common issues predominate, then considerations of class management and the advantages of class treatment should fall into their logical place. Nonetheless, all should be advised that the undersigned has considered the "superiority" and "manageability" of class treatment, and only a few additional comments should suffice in this regard.

In light of the large number of potential class members and the strong predominance of common issues, the court concludes, without reservation, that the class action is supe-

rior to other methods of adjudication.[27] The court is convinced that individual actions by claimants would impose a strangling harness on the judiciary, as well as the parties. Separate actions would produce considerable duplication of effort, increase the cost of litigation, create the risk of inconsistent results for parties who are similarly situated, and consume judicial resources to wasteful levels (through duplication) throughout the country. Furthermore, the court is counseled by the possibility that potential claimants with small claims, which would not justify the cost of individual litigation, would simply abandon their claims altogether. The court perceives that the difficulties which may be encountered in the manageability department will be—well—manageable. As noted above, if the litigation proceeds to the stage where individual damage assessment is necessary, then the court will employ reasonable means and methods to streamline individual interests so that notions of judicial economy are well served. In any event, the management of individual interests which may arise are an acceptable trade-off and are not particularly compelling when compared to the advantages of consolidated treatment of common issues of liability.

In conclusion, the court will issue an appropriate order certifying the class as proposed in the plaintiffs' consolidated motion for class certification. Should adjustments or modifications of the class prove necessary, then the court will, in due course, issue such necessary orders as to best achieve the purposes of Rule 23. "An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits." F.R.C.P. 23(c)(1).[28] Initial certifications of class actions are not set in stone, and the rules fully contemplate that as discovery progresses and the parties exchange knowledge within their possession, some tailoring may be necessary.[29] 7B Charles A. Wright & Arthur R. Miller, *Fed.*

*Prac. and Proc.* § 1791 (1986). "The act of refining a class definition is a natural outcome of federal class action practice." *In re Domestic Air Transp. Litig.,* 137 F.R.D. 677, 683 n. 5 (N.D.Ga.1991).

### Rule 23(b)(2) Certification

Plaintiffs have also moved for Rule 23(b)(2) certification which is designed to pave the way for class certification where equitable, injunctive relief is sought with respect to the class.

**(b) Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\* \* \* \* \* \*

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

\* \* \* \* \* \*

F.R.C.P. 23(b)(2).

In their prayer for relief, plaintiffs have included a demand for equitable relief in addition to their demand for treble damages; and, plaintiffs allege that the demand for equitable relief is an "integral part of the relief for the proposed class." Despite the asserted importance of the demand for injunctive relief, plaintiffs devote less than one page to 23(b)(2) certification in a fifty page brief which they have submitted to the court. Likewise, defendants spend only one paragraph in arguing against 23(b)(2) certification. Therefore, the court cannot help but wonder how "integral" certification for injunctive relief might be in this litigation. In any event, the court will also certify the proposed class pursuant to Rule 23(b)(2) for final injunctive relief or corresponding declaratory relief with respect to the class as a

---

**27.** The court also considers that the majority of the individual actions as listed in footnote two were filed in this district, and it appears that key events which will be in issue are alleged to have taken place in this district. *See* F.R.C.P. 23(b)(3)(A–D).

**28.** *See* F.R.C.P. 23(c)(4) & 23(d).

**29.** For example, the exact dates of the alleged conspiracy are unknown. Plaintiffs allege that the conspiracy began "at least as early as 1981" and continued "through at least 1990, the exact dates being unknown to plaintiffs...."

whole. In doing so, the court recognizes that in the past, certification under 23(b)(2) was not deemed appropriate where treble money damages under the Clayton Act was the primary relief sought. *See Wilcox Development Co. v. First Interstate Bank of Oregon,* 97 F.R.D. 440, 446 (D.Or.1983); *Krehl v. Baskin Robbins Ice Cream Co.,* 78 F.R.D. 108, 117 (C.D.Cal.1978). However, more recent trends in Rule 23(b)(2) utilization appear to favor a broader application of equitable relief certification; and, 23(b)(2) certification has been ordered where the primary relief sought was clearly money damages pursuant to 23(b)(3). *See In re Domestic Air Transp. Litig.,* 137 F.R.D. 677, 696 (N.D.Ga.1991); *Northwestern Fruit Co. v. A. Levy & J. Zentner Co.,* 116 F.R.D. 384, 388 (E.D.Cal. 1986).

Catfish processing is a relatively young industry in this country. The plaintiffs have alleged the existence of a price fixing conspiracy which, if true, began with the inception of this industry and has lasted until recently. To say the least, the existence of an illegal antitrust conspiracy in this new industry would be met with extreme disappointment. Hence, it is this fact which counsels the court that 23(b)(2) certification would present no harm or hardship on the industry.

### Conclusion

In summary, the motions to dismiss which were filed by the individual defendants will be denied based on the reasons stated in this memorandum opinion. Furthermore, the plaintiffs' consolidated motion for class certification will be granted. The court, pursuant to F.R.C.P. 23(a) and 23(b)(2) and 23(b)(3), finds that this litigation meets the requisites for class certification and class treatment. In accord with the spirit of Rule 23 and the necessity of effective class management, the court is available to the parties, of course, to review any proceedings and to issue appropriate orders which the court deems in the best interest of the litigation. Regarding the notice provisions of Rule 23(c)(2) in light of 23(b)(3) certification, the parties will find an order from the court which accompanies this memorandum opinion. As explained in the order, the court expects recommendations

from the parties regarding the content, timing, and method of providing effective notice to potential class members. Accompanying this memorandum opinion, the court will issue appropriate orders to address the pending motions which are consistent with this memorandum opinion and any other procedural matters that might need attention.