**In re Alether THOMPSON.**

**Alether Thompson, Plaintiff,**

**v.**

**HomEq Servicing Corporation, Defendant.**

**Bankruptcy No. 99–40881–DWH.**
**Adversary No. 03–1153–DWH.**

United States Bankruptcy Court, N.D. Mississippi.

Aug. 15, 2006.

Brian K. Herrington, Sweet & Freese, PLLC, Jackson, MS, Gawyn Mitchell, Columbus, MS, for Plaintiff.

Virginia W. Barnhart, Pope & Hughes, P.A., Towson, MD, D. Andrew Phillips, Mitchell, McNut & Sams, P.A., Oxford, MS, for Defendant.

## OPINION

DAVID W. HOUSTON, III, Bankruptcy Judge.

On consideration before the court is the motion for class certification filed by the plaintiff, Alether Thompson (Thompson); objection to said motion having been filed by the defendant, HomEq Servicing Corporation (HomEq); and the court, having heard and considered same, hereby finds as follows, to-wit:

I.

The court has jurisdiction of the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157, as well as, the General Order of Reference entered by the United States District Court for the Northern District of Mississippi on July 27, 1984.

This cause of action would be considered a core adversary proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (B), and (O).

II.

On January 2, 1998, the plaintiff, Thompson, obtained a loan from a non-party lender, Southeast Funding, Inc., in the original principal sum of $28,000.00, which was secured by a deed of trust encumbering her residential real property. The loan is being serviced by the defendant HomEq. Shortly after obtaining this loan, Thompson filed a voluntary Chapter 13 bankruptcy petition on February 16, 1999.

In the above captioned adversary proceeding, Thompson has alleged that subsequent to her bankruptcy filing, HomEq improperly posted to her account and impermissibly collected from her certain fees and expenses which were not approved by the bankruptcy court. These fees and expenses, totaling $2,844.19 and denominated by HomEq as "corporate advances," were initially summarized in a letter from HomEq to Thompson, dated August 6, 2001, in response to an account inquiry made by Thompson. They were delineated in greater detail in the affidavit of John Dunnery, a HomEq corporate representative, dated June 23, 2006, as follows:

| Nature of Advance Complained Of | Amount | Date of 3rd Party Service (if applicable) | Date Posted (i.e. date paid by HomEq) | Pre–Petition, Post–Petition/Pre–Conf. Or Post–Confirmation |
|---|---|---|---|---|
| Breach Letter Fee | 35.00 | 11/98 | 11/11/98 | Pre–Petition |
| Breach Letter | 35.00 | 02/99 | 02/25/99 | Pre–Petition |
| Appraisal (BPO) | 250.00 | 01/30/99 | 02/22/99 | Pre–Petition |
| Appraisal (BPO) | 250.00 | 11/18/99 | 12/02/99 | Post–Confirmation |
| Appraisal (BPO) | 250.00 | 05/01/00 | 05/18/00 | Post–Confirmation |
| Appraisal (BPO) | 255.00 | 11/06/00 | 11/21/00 | Post–Confirmation |
| Appraisal (BPO) | 285.00 | 04/24/01 | 05/08/01 | Post–Confirmation |
| Foreclosure Fees | 350.00 | 02/99 | 04/15/99 | Pre–Petition |
| POC Fees | 250.00 | 03/99 | 04/23/99 | Post–Petition |
| Attys Fees | 50.00 | 11/23/00 | 12/11/00 | Post–Confirmation |
| Delinquent Taxes | 583.99 | | 02/24/00 | Post–Confirmation |
| P & I Shortage Advance | .20 | | 02/10/98 | Pre–Petition |
| P & I Shortage Advance | 250.00 | | 12/12/00 | Post–Confirmation |
| TOTAL | 2844.19 | | | |

The August 6, 2001 letter indicates that a total of $500.00 had been paid toward the corporate advances, leaving an outstanding balance of $2,344.19. The timing or source of this $500.00 amount, specifically whether it came from Thompson, was not fully explained. Dunnery was asked about this in HomEq's Rule 30(b)(6) deposition, but the excerpt furnished to the court did not reflect his complete answer.

Through the Dunnery affidavit, HomEq described the procedures that it employs in processing the accounts that it services. The following numbered paragraphs are extracted from the affidavit; to-wit:

4. When HomEq incurs a fee or charge for a third party service in connection with a debtor's loan, it pays the invoice and records the payment as a "corporate advance" in HomEq's computer system, the same way that businesses generally make accounting entries for expenses that they incur. Examples of such charges include: (i) attorney's fees occurred in collection, foreclosure or bankruptcy matters (sometimes referred to as proof of claim or POC fees, foreclosure fees, attorney's fees, or breach letter fees); (ii) associated court filing fees; and (iii) appraisal or valuation fees (sometimes referred to as Broker's Price Opinions or BPO fees).

5. HomEq also occasionally makes payments to taxing authorities for delinquent taxes owing on property which secures the loans that it services in order to preserve a lender's lien and avoid the sale of secured property at a tax sale. Such payments are recorded as "escrow advances" in HomEq's computer system.

8. Many corporate advances are not collected from debtors, but instead are written off or later reimbursed by the lender who holds the loan. Others are approved and paid through approved plans, approved foreclosure petitions, motions for relief from stay, or Rule 2016 motions, or by negotiated agreements with debtors.

10. Following notification of a debtor's bankruptcy, it is HomEq's practice to move unpaid corporate advances into one of two suspense accounting categories: (a) a category identified as "Non–Recoverable Corporate Advances"; or (b) a category identified as "Third Party Recoverable," sometimes referred to as the "T-bucket."

11. Advances in the T-bucket or Non–Recoverable category are then reviewed with bankruptcy counsel to determine which can be collected through a proof of claim or the debtor's plan (generally pre-petition charges, although some jurisdictions allow collection of POC fees and other pre-confirmation charges via approved plans).

12. Charges incurred during the pendency of a bankruptcy are generally posted to the "T–Bucket" and then, after further review, are either: (a) included in the detail underlying lift-stay motions, (b) included in POCs or amended POCs in jurisdictions which allow limited post-petition charges to be included in a proof of claim, (c) included in 2016 motions, (d) written off, in whole or in part, and/or (e) reimbursed by the lender to HomEq.

Dunnery then explained the corporate advances that were charged to Thompson's account, set forth hereinabove, as well as, the complexity of the procedures undertaken to compile this data, to-wit:

17. Attached to the Opposition (Opposition to Motion for Class Certification)as an exhibit is a Transactional History Reconciliation for Ms. Thompson's Loan. This reconciliation is not a document that can be simply reproduced through HomEq's accounting system for each debtor's loan. It is drawn from different data sources, her bankruptcy, foreclosure and collection files, and the communications log regarding the Plaintiff's loan. It required over a full business day to create this reconciliation.

18. While HomEq's data records can produce a report reflecting advances by type posted to serviced loans, this data does not reflect when the underlying charge was incurred or whether the debtor was in bankruptcy at the time the charge was posted. Nor does the data reflect whether the underlying bill was incurred pre-petition, pre-confirmation or post-confirmation, whether the particular advance was included in a proof of claim or an amended proof of claim, or whether it was approved as part of a Chapter 13 plan, a motion for relief from stay, a Rule 2016 Motion or by other court order. It also does not reflect whether the bankruptcy was dismissed without discharge. If the advance was incurred while the debtor was not in bankruptcy, the data does not reflect whether the particular advance was approved in a foreclosure or collection action, or was compromised in a settlement with the debtor. Nor does this data reflect whether the advance was paid, written off, or reclassified as non-recoverable or third party recoverable.

19. In order to determine the circumstances and timing under which an advance was posted, whether it has been repaid by a debtor, approved or allowed by a court, compromised or written off, requires reconciliation with data and information from many data and paper sources. This would require the review and reconciliation of the communications loan on each debtor's loan, each debtor's bankruptcy, foreclosure and collection files (data and paper), payment records, bankruptcy and foreclosure filings, and sometimes underlying bills and correspondence with third party providers of default related services. The burden to accomplish this for all bankruptcy loans serviced by HomEq is insurmountable.

## III.

Thompson's original Chapter 13 plan was confirmed by an order entered April 23, 1999. Sometime thereafter, according to her bankruptcy attorney, Thompson received a settlement in a Phen Phen product liability cause of action. Consequently, on June 4, 2001, she filed a motion to modify her confirmed Chapter 13 plan,

proposing to fully satisfy the non-long term obligations that were due under the plan. This proposal was not applicable to the regular monthly installments that would later accrue under the debt being serviced by HomEq. An order was entered on July 9, 2001, confirming the modified plan, and an order was entered on October 18, 2001, granting Thompson a Chapter 13 discharge. The bankruptcy case was closed shortly thereafter.

On June 23, 2003, Thompson filed a motion to reopen her bankruptcy case to file the subject adversary proceeding against HomEq. This was apparently prompted by two notices sent by HomEq to Thompson which are described as follows:

1. Default notice, dated February 14, 2003, advising Thompson that she was in default in the sum of payments that had come due after the date of default, January 7, 2003, plus late charges and other expenses totaling $3,640.11.

2. Payoff itemization notice, dated May 14, 2003, advising Thompson that the total payoff on her debt was $27,550.47, which included recoverable corporate advances of $3,270.15.

The Dunnery affidavit, mentioned hereinabove, provides some insight concerning these two notices. The following paragraphs are extracted, to-wit:

25. The Plaintiff has also challenged advances made following the discharge of her 1999 bankruptcy. Following her discharge, the Plaintiff again fell into arrears and was sent a breach letter dated February 14, 2003, providing notice of her default and of her right to cure this arrearage by paying the amount necessary to bring her loan current, described in this letter as "the sum of payments that have come due on or after the date of default, 01/07/2003, plus late charges, periodic adjustments to the monthly payment amount (if applicable) and other expenses associated with collection, all of which total $3,640.11."

26. The corporate advances outstanding on Plaintiff's loan were later detailed by HomEq in a payoff statement requested by the Plaintiff's counsel. This payoff statement and the February 14, 2003 breach letter were issued while the Plaintiff was not in bankruptcy.

27. After the Plaintiff returned to bankruptcy, the corporate advances on her loan were reclassified as "non-recoverable" and "3rd Party Recoverable" as reflected on her Transactional History Reconciliation. HomEq has not collected these reclassified advances and does not intend to do so.

### IV.

Thompson contends that because HomEq's conduct, as described hereinabove, is so pervasive that her complaint should be certified as a class action pursuant to Rule 23(a) and (b), Federal Rules of Civil Procedure, which is made applicable to bankruptcy adversary proceedings by Rule 7023, Federal Rules of Bankruptcy Procedure. She has proposed that a nationwide class be certified consistent with the following definition, to-wit:

> for three years preceding the filing of Plaintiff's complaint, all former or present Chapter 13 debtors whose mortgage loans were serviced by Defendant at some time during the term of their bankruptcies and on whose accounts Defendant posted post-petition charges, which charges were not approved by the Bankruptcy Court.

> This class does not include any employees of Defendant, the judges assigned to this action, or their relatives.

The requirements of Rule 23(a) and (b), Federal Rules of Civil Procedure, which determine whether a class action should be certified, are set forth as follows:

**Rule 23. Class Actions**

**(a) Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

**(b) Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

### V.

■ This court is of the opinion that the mere act of posting charges or corporate advances to an account for record keeping purposes, *standing alone,* does not run afoul of the provisions of the Bankruptcy Code. However, the act of collecting or attempting to collect these charges from a bankrupt debtor can be impermissible depending on the relevant circumstances, such as, what was the justification for the assessment of the charges, were the charges reasonable in amount, when did they accrue, when were the charges collected or when was the collection activity attempted, did the collection activity occur without court approval, was the posting of the charges to the account undertaken for an illegal or improper purpose, etc.

Accordingly, insofar as Thompson's adversary proceeding is concerned, there are a number of unanswered *factual* questions, to-wit:

1. Was the $500.00 amount, mentioned in the August 6, 2001 letter, or any

amount, actually collected from Thompson?

2. What were the underpinnings of the charges, totaling $3,640.11, set forth in the default notice of February 14, 2003, and what were the underpinnings of the recoverable corporate advances, totaling $3,270.15, set forth in the payoff itemization notice of May 14, 2003?

3. When did these latter charges accrue? Did they include any of the charges that were listed in the August 6, 2001 letter?

4. Are these charges reasonable?

5. Despite the assertions in the Dunnery affidavit, were any of these latter charges ever collected from Thompson? If so, were the collection activities properly authorized?

6. Other than to ultimately effect collection, is there an undisclosed illegal or improper purpose for posting the corporate advances to Thompson's account?

Pre-trial discovery might well "flesh out" the answers to these questions and reveal that Thompson was indeed the victim of impermissible lending practices. Although the answers are not necessary to resolve the current motion for class certification, they certainly must be addressed if this proceeding is to survive for Thompson or any potential members of a certifiable class.

■ As a corollary to the aforesaid factual questions, a significant *legal* question that must be addressed is the identification of the Bankruptcy Code sections that are purportedly implicated by HomEq's conduct. For example, at one point the court thought that §§ 362(a) and (h) were being pursued by Thompson, but the proposed class definition, set forth hereinabove, does not expressly or impliedly support this assumption. Indeed, at this point, the class definition proposed by Thompson is defective as a matter of law because it does not address an action necessarily prohibited by the Bankruptcy Code or even a wrong perceptible to this court.

■ The court understands, as pointed out by Thompson, that the class certification process is essentially procedural, and the court's inquiry on a certification motion should be focused primarily on whether the requirements of Rule 23 can be satisfied. *See, In re Catfish Antitrust Litig.*, 826 F.Supp. 1019 (N.D.Miss.1993). However, the proposed class definition must at least state a cognizable cause of action against the defendant. In this adversary proceeding, it does not. *See, In re Heath*, 305 B.R. 249 (Bankr.N.D.Miss. 2004).

■ Insofar as class certification is concerned, the court believes that Thompson can satisfy the numerosity requirement of Rule 23(a)(1), and the requirement of Rule 23(a)(4) that she and her attorneys will fairly and adequately protect the interest of the proposed class. However, the requirements of Rule 23(a)(2) and (3), the provisions dealing respectively with commonality and typicality, have been addressed by Thompson only in generalized, unsupported assertions. There has been no empirical evidence presented, which is usually developed through statistical sampling, that would even begin to convince this court that Thompson's complaint involves questions of law or fact common to any other potential class member, or that her claims are typical of the claims of any other potential class member. Until there can be a showing through some credible testimony or documentation that the commonality and typicality requirements can be met, there can be no class certification. This also presumes that Thompson can redefine a class which will address a cognizable cause of action that exists pursuant

to the provisions of the Bankruptcy Code. Consequently, the motion for class certification, in its current posture, is not well taken.

Until the requirements of Rule 23(a) can be met, there is no reason for the court to discuss the injunctive relief that can be provided under Rule 23(b)(2). Likewise, the court sees no need to address HomEq's argument that Thompson has no right to seek class certification since she has no "private right of action" to obtain relief for conduct that violates the Bankruptcy Code in general. This court has already "crossed this bridge" in its earlier decision, *In re Harris*, 297 B.R. 61 (Bankr. N.D.Miss.2003). The court's opinion has not changed as to this issue.

## VI.

For the reasons cited hereinabove, the court finds that Thompson's motion for class certification cannot be sustained. By a separate order, which will be entered contemporaneously herewith, the said motion will be overruled without prejudice.